UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NIRVA AUGUSTIN,

                             Plaintiff,

        -v-

THE YALE CLUB OF NEW YORK CITY,

                             Defendant.

Case No. 03-CV-1924 (KMK)

OPINION & ORDER

Appearances:

Kenneth W. Richardson, Esq.
New York, New York
*Counsel for Plaintiff*

Diane Krebs, Esq.
Gordon & Rees LLP
New York, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        On March 19, 2003, Plaintiff Nirva Augustin ("Augustin") filed an employment

discrimination action against Defendant The Yale Club of New York City ("Yale Club" or

"Club"),[1] stemming from her employment as a member of the Yale Club wait-staff, alleging that

Plaintiff was the victim of a sexually and/or racially hostile work environment, was retaliated

against for complaining about the hostile environment, and was wrongfully terminated as a result

of her sex and race.[2]  (Compl. 1-5)  After discovery closed, Defendant filed a Motion for

_____

        [1] This case was reassigned to this Court on September 14, 2004.

        [2] Initially Plaintiff also alleged claims for disability discrimination, national origin
discrimination, religious discrimination, failure to accommodate, and failure to promote.  In a
Stipulation and Order of Dismissal filed February 10, 2005, Plaintiff consented to and the Court

Summary Judgment seeking to dismiss Plaintiff's Complaint in its entirety, pursuant to Fed. R. Civ. P. 56.  For the reasons stated below, Defendant's Motion for Summary Judgment is granted in its entirety.

## I.  Facts

### A.  Plaintiff's Failure to Comply With Local Rule 56.1

Under Local Rule 56.1 of the Local Civil Rules of this Court, a movant is required to submit a "short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civil Rule 56.1(a).  The Rule also requires that the papers opposing a motion for summary judgment should include paragraphs corresponding to the statements of the moving party and "if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civil Rule 56.1(b).  Unless "specifically controverted" by the opposing party's statement, all material facts set forth in a movant's 56.1 statement "will be deemed to be admitted."  Local Civil Rule 56.1(c).  The Rule also requires that "[e]ach statement of material fact by the movant or opponent . . .  including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible . . . ."  Local Civil Rule 56.1(d).

A proper Rule 56.1 statement in opposition to a motion for summary judgment must respond in a "'paragraph-by-paragraph response to the movant's 56.1 statement,'" alerting the court as to what facts, if any, the non-movant contends there exists a genuine issue of dispute. *Gallimore-Wright v. Long Island R.R.*, 354 F. Supp. 2d 478, 482 (S.D.N.Y. 2005) (quoting

ordered dismissal of these claims with prejudice.  (Doc. No. 31)

*Rodriguez v. Schneider*, No. 95 Civ. 4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999)).  While a non-movant can submit a separate statement, apart from the paragraph-by-paragraph response, "'this separate statement is *not* a substitute for the paragraph-by-paragraph response.  The non-movant, particularly if represented by counsel, should not leave it to the court to cull from this separate statement the pieces of evidence which would support the contentions of the non movant asserted in its paragraph-by-paragraph response without citation.'"  *Id.* at 483 (quoting *Rodriguez*, 1999 WL 459813, at *1 n.3).

In this case, Defendant has submitted a thirty-three page Rule 56.1 statement containing eighty-seven numbered paragraphs, each of which properly cites evidence in the record.  Plaintiff's Rule 56.1 statement paragraphs do not correspond to Defendant's paragraphs.  In addition, Plaintiff's paragraphs, treated as "additional paragraphs," do not not respond to any of Defendant's paragraphs with admissible evidence.  Instead, Plaintiff submitted a thirty-four paragraph 56.1 statement, wherein each statement either does not dispute Defendant's 56.1 statements, or cites for support to an affidavit submitted by Plaintiff that contradicts her earlier testimony given in her lengthy deposition.  It is well-accepted that a plaintiff cannot create issues of fact by submitting an affidavit to the Court contradicting her prior deposition testimony.  *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 (2d Cir. 1999) ("It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that . . . contradicts the affiant's previous deposition testimony.") (internal quotations and citation omitted); *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his

own prior sworn testimony." (collecting cases)); *cf. Palazzo v. Corio*, 232 F.3d 38, 43-44 (2d Cir. 2000) (holding that the principle that a party who testified to a given fact in a deposition cannot create triable issue on summary judgment by submitting affidavit denying a fact "does not apply if the deposition and the later sworn statement are not actually contradictory . . . [,] where the later sworn assertion addresses an issue that was not, or was not thoroughly or clearly, explored in the deposition," or where the, "testimony is contradicted by evidence other than the deponent's subsequent affidavit"). Thus, to the extent the assertions in Defendant's Rule 56.1 statements are supported by admissible evidence, and otherwise uncontroverted by admissible evidence, the Court accepts them as true. *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (failure to respond to a moving party's Rule 56.1 Statement may mean that the uncontested facts contained therein will be assumed to be true for the purposes of the motion if such facts are properly supported by citations to admissible evidence); *Gallimore-Wright*, 354 F. Supp. 2d at 483 (admitting facts asserted by movant that properly cited to admissible evidence and were not responded to by non-movant).

      B.  The Evidence

       1.  Background

      The Yale Club is a private social club in Manhattan that provides a variety of facilities to its members, including the use of its three restaurants – the Roof Dining Room, the Tap Room, and the Grill – as well as its banquet rooms for private parties. (Aff. of Keith Mazanec ¶ 3 ("Mazanec Aff."); Def.'s 56.1 Statement ¶ 1) The Yale Club had a harassment-free and anti-retaliation workplace policy throughout the relevant time period in the Complaint. (Mazanec Aff. Ex. 2, at 23; Diane Krebs Decl. Ex. B ("Krebs Decl."); Def.'s 56.1 Statement ¶ 3) Plaintiff

signed an acknowledgment form at the beginning of her employment indicating that she received

a copy of the Yale Club's Sexual Harassment Policy.  (Mazanec Aff. Ex. 5; Def.'s 56.1

Statement ¶ 3)  Plaintiff also admitted she received a copy of the Yale Club's Equal Employment

Opportunity Policy from the Human Resources Director, Ruth Ormston ("Ormston"), during

Plaintiff's first year of her employment at the Yale Club.  (Krebs Decl. Ex. B; Augustin Tr. 399-

400; Def.'s 56.1 Statement ¶ 3)

     All Yale Club waiters are represented by Local 6 of the Hotel, Restaurant and Club

Employees and Bartenders Union, AFL-CIO ("Local 6" or "Union").  (Mazanec Aff. ¶ 5, Def.'s

56.1 Statement ¶ 4)  The Union and the Yale Club are parties to a collective bargaining

agreement ("CBA"), which governs many of the terms and conditions of Union members'

employment, including compensation, discipline, and grievance and arbitration procedures.

(Mazanec Aff. 5; Mazanec Aff. Ex. 1; Def.'s 56.1 Statement ¶ 4)  Under the CBA, the Yale Club

has the right to establish reasonable work rules and to maintain discipline and efficiency (unless

otherwise in conflict with the CBA).  (Mazanec Aff. Ex. 1, at 26-27; Def.'s 56.1 Statement ¶ 4)

     Waiters working in the Yale Club's three restaurants fall under the title "ala carte," while

wait-staff working at functions held at the Yale Club, such as weddings, are called "banquet

waiters."  (Mazanec Aff. ¶ 5; Def.'s 56.1 Statement ¶ 5)  Typically, most wait-staff were

specifically hired as either ala carte or as a banquet waiter.  (Mazanec Aff. ¶ 5; Def.'s 56.1

Statement ¶ 5)  The tasks of a banquet waiter, in the chronological order of an event, typically

include:  (i) determining with whom the waiter is partnered and the table for which the waiter and

the partner are responsible; (ii) determining the number of guests at the assigned table and

number of courses to enable the proper setting of the table; (iii) setting the table with the proper

linens and utensils; (iv) listening for the captain's instructions regarding the sequence of stages of an event, such as when to light candles and when the guests will arrive; (v) if there is a reception in a different room from the function, one partner works the reception and the remaining partner finishes setting up the perishable items on the table; (vi) during the function, the waiters serve in accordance with the menu and the regular pick-up procedures in the kitchen.  (Augustin Tr. 104-06, 110-11, 113; Def.'s 56.1 Statement ¶ 6)

At banquet functions, waiters usually worked in teams of two.  (Augustin Tr. 104, 107-08)  As a result, communication between partners was very important in order to make sure that tables were served quickly and efficiently.  (Augustin Tr. 106-107; Def.'s 56.1 Statement ¶ 7)  Waiters were mainly responsible for their assigned tables, but if a guest from another table asked another waiter for service, waiters were instructed to help that guest.  (Augustin Tr. 108; Def.'s 56.1 Statement ¶ 7)  Although the tasks of an ala carte waiter were different from those of a banquet waiter, it was also important for ala carte waiters to be responsive to guests and work cooperatively both with their partner, and other waiters within the restaurant, to ensure that the "guest comes first."  (Augustin Tr. 137-38; Def.'s 56.1 Statement ¶ 8)

The Yale Club repeatedly emphasized to its banquet waiters that teamwork and cooperation were important in serving the guests.  For example, the wait-staff's captains held regular meetings with the banquet waiters to remind them of the importance of working together and making sure the guests were happy.  (Augustin Tr. 113-14; Def.'s 56.1 Statement ¶ 7)  Plaintiff understood this concept was part of the service provided by the Yale Club and this message was reinforced in the Yale Club's "Banquet Department Steps of Service" manual that Plaintiff received in mid-2002 (Mazanec Aff. Ex. 3; Augustin Tr. 410-11, 414-16; Def.'s 56.1

Statement ¶ 9)  Another important requirement for the Yale Club's wait-staff was to act respectfully and courteously, not only towards guests, but also towards co-workers.  (Mazanec Aff. ¶ 6; Def.'s 56.1 Statement ¶ 10)  This policy was explicitly outlined in the Club's Employee Handbook:  "All Club Employees are expected to comport themselves at all times in a professional and businesslike manner, including being courteous and respectful of all fellow Employees, Members, guests and visitors."  (Mazanec Aff. Ex. 2, at 15; Def.'s 56.1 Statement ¶ 10)

### 2.  Plaintiff's Employment at the Yale Club

Plaintiff was initially hired by the Yale Club in or about September 1996 as an extra banquet waiter.  (Augustin Tr. 54-56; Def.'s 56.1 Statement ¶ 11)  Thereafter, Plaintiff worked intermittently as both a banquet waiter and an ala carte waiter.  (Augustin Tr. 60, 68-69; Def.'s 56.1 Statement ¶ 11)  In January 1997, Plaintiff was offered and accepted a permanent part-time ala carte lunch position at the Club, on the condition that she would also have the chance to work as a banquet waiter.  (Augustin Tr. 61-64; Mazanec Aff. Ex. 4; Def.'s 56.1 Statement ¶ 12)

When Plaintiff began her permanent employment at the Club, Ormston was the Human Resources Director.  (Augustin Tr. 75-76; Def.'s 56.1 Statement ¶ 13)  Plaintiff found Ormston to be a nice, responsive, and fair person.  (Augustin Tr. 76, 572-73; Def.'s 56.1 Statement ¶ 13)  In June 2000, Ormstom retired and her position was filled, in September 2000, by Keith Mazanec ("Mazanec").  (Mazanec Aff. ¶¶ 1, 9; Augustin Tr. 291; Def.'s 56.1 Statement ¶ 13)

At the outset of Plaintiff's employment at the Club, the food and beverage director was Kimberly Nevin ("Nevin").  (Augustin Tr. 61; Mazanec Aff. ¶ 8; Def.'s 56.1 Statement ¶ 14)  Nevin had direct supervisory responsibility over the managers of the Club's restaurants.

(Mazanec Aff. ¶ 8; Def.'s 56.1 Statement ¶ 14)  Plaintiff got along with Nevin and found her to

be a decent supervisor.  (Augustin Tr. 71; Def.'s 56.1 Statement ¶ 14)  In late June 1997, Nevin

left the Club and after a few months her position was filled by Dawn Flynn ("Flynn").  (Augustin

Tr. 150-51; Mazanec Aff. ¶ 8; Def.'s 56.1 Statement ¶ 14)  In the period before Flynn was hired,

the Club created the new position of Director of Restaurants, which was assumed, in June 1997,

by Michael O'Driscoll ("O'Driscoll").  (Mazanec Aff. ¶ 8; Def.'s 56.1 Statement ¶ 14)  Plaintiff

found O'Driscoll to be nice and responsive to her concerns.  (Augustin Tr. 150; Def.'s 56.1

Statement ¶ 14)  O'Driscoll only remained in the new position until the end of October 1997

when the position was discontinued.  (Mazanec Aff. ¶ 8; Def.'s 56.1 Statement ¶ 14)

Plaintiff's direct supervisor in the Tap Room restaurant at all relevant times was Carlos

Gonzales ("Gonzales").  (Augustin Tr. 157; Def.'s 56.1 Statement ¶ 15)  Her supervisor in the

banquet department at all relevant times was Kevin O'Brien ("O'Brien"), the Club's Catering

Director.  (Mazanec Aff. ¶ 11; Def.'s 56.1 Statement ¶ 15)  This position entailed, among other

things, directly supervising banquet wait-staff, including conducting performance evaluations

and engaging in disciplinary actions.  (Mazanec Aff. ¶ 11; Def.'s 56.1 Statement ¶ 15)  At all

relevant times, Alan Dutton ("Dutton") was the general manager of the Yale Club.  (Mazanec

Aff. ¶ 1; Def.'s 56.1 Statement ¶ 15)  When working as a banquet waiter, Plaintiff's captain

varied with each banquet.  Generally, there were four captains with whom Plaintiff worked:

Carlos Cabrera ("Cabrera"), Charles Garcia ("Garcia"), Antonio Rojas ("Rojas"), and James

Hannigan ("Hannigan").  (Augustin Tr. 114-15; Def.'s 56.1 Statement ¶ 15)  Captains had no

review or disciplinary power over banquet wait-staff, as their role was limited to ensuring that

functions went smoothly and service was appropriately provided.  (Mazanec Aff. ¶ 11; Def.'s

56.1 Statement ¶ 15)

### 3.  June 1997 Daskalakis Incident

Shortly after Plaintiff's employment began, she started to have difficulties interacting with co-workers, which were documented in her personnel records.  (Mazanec Aff. ¶ 9; Def.'s 56.1 Statement ¶ 15)  A summary contained in Plaintiff's file documents that in 1997-98 alone, she participated in over a dozen separate disputes with over a dozen different co-workers. (Mazanec Aff. ¶ 9; Mazanec Aff. Ex. 30; Def.'s 56.1 Statement ¶ 15).  The first such incident occurred in June 1997 between Plaintiff and her banquet captain Antonio Daskalakis ("Daskalakis").  (Mazanec Aff. Exs. 6, 30; Def.'s 56.1 Statement ¶ 17)  According to Plaintiff, Daskalakis complained to Club management that Plaintiff failed to follow an instruction he gave her to clear glasses from the bar area.[3]  (Augustin Tr. 241-43; Def.'s 56.1 Statement ¶ 17)  At a June 3, 1997 meeting, Ormston met with Augustin and Daskalakis to address the complaint where she told both employees that the Yale Club "would not tolerate this unbecoming behavior and they should stop calling each other names."  (Mazanec Aff. Ex. 6; Def.'s 56.1 Statement ¶ 17)  Both employees agreed that they would try to work out their problems and that should there be a problem in the future, they should quickly bring it to Management's attention so that it could be addressed.  (Mazanec Aff. Ex. 6; Def.'s 56.1 Statement ¶ 17)

### 4.  June 1997 Regalado Incident

In response to a complaint made by Plaintiff, Ormston held another meeting on June 5, 1997 with Plaintiff and line cook Gennaro Regalado ("Regalado").  (Mazanec Aff. Ex. 7; Def.'s

---

[3] The Club memorandum documenting the complaint states that it was lodged by Augustin alleging that Daskalakis had harassed her by making negative remarks about her work to other waiters.  (Mazanec Aff. Ex. 6)

56.1 Statement ¶ 18)  The complaint stemmed from a remark Regalado made to Plaintiff.

Regalado told Plaintiff that "Tony is looking for you," and in response to Plaintiff's inquiry,

identified him as "Tony the Greek."  (Mazanec Aff. Ex. 7; Def.'s 56.1 Statement ¶ 18)  Plaintiff

then asked, "When was Tony looking for me this morning, [or] last night?"  Regalado responded,

"I do not remember, you will go on vacation with him to Greece."  (Mazanec Aff. Ex. 7; Def.'s

56.1 Statement ¶ 18)  Plaintiff, in turn said, "I have been to Greece."  (Mazanec Aff. Ex. 7;

Def.'s 56.1 Statement ¶ 18)  Regalado also mentioned that he knew Plaintiff "was in hot water."

(Mazanec Aff. Ex. 7; Def.'s 56.1 Statement ¶ 18)

At the meeting with Ormston, held the afternoon of the incident, Regalado said that he

meant his statements as a joke.  He apologized to Plaintiff, and recognized that it was bad

judgment on his part.  (Mazanec Aff. Ex. 7; Def.'s 56.1 Statement ¶ 18)  Ormston then cautioned

Regalado that such joking was unacceptable and he should be careful about joking around with

other employees.  (Mazanec Aff. Ex. 7; Def.'s 56.1 Statement ¶ 18)  After the meeting with

Ormston, and Regalado's apology, relations between Plaintiff and Regalado resumed as normal ,

Plaintiff had no further problems with Regalado, and Plaintiff considered the matter resolved.

(Augustin Tr. 237-40; Def.'s 56.1 Statement ¶ 18)

### 5.  June 18, 1997 Ormston Meeting

On June 18, 1997, Ormston held another meeting with Plaintiff.  (Mazanec Aff. Ex. 8)

The meeting was in response to a complaint from Carlos Gonzalez, a Headwaiter, that Plaintiff's

co-workers complained to him that they did not want to work with Plaintiff because of the

difficulty in getting along with her.  (Mazanec Aff. Ex. 8; Def.'s 56.1 Statement ¶ 19)  Ormston

told Plaintiff of the complaints and that her attitude upset employees who worked with her.

(Mazanec Aff. Ex. 8; Def.'s 56.1 Statement ¶ 19)  Ormston also advised Plaintiff that the situation was serious and that if the Club continues to receive such complaints it would be necessary to revisit the issue, which could result in disciplinary action.  (Mazanec Aff. Ex. 8)  Plaintiff was also advised that, in the future, if she had any problems with her partner she should bring it to the attention of the Headwaiter.  (Mazanec Aff. Ex. 8; Def.'s 56.1 Statement ¶ 19)

### 6. July 8, 1997 O'Driscoll Meeting

On July 8, 1997, Plaintiff approached O'Driscoll concerning her request to change her vacation dates.  (Mazanec Aff. Ex. 9)  At this meeting, O'Driscoll asked Plaintiff how she was doing at her job.  (Mazanec Aff. Ex. 9)  Plaintiff said she "was being discriminated against and harassed by the management and fellow workers."  (Mazanec Aff. Ex. 9)  When asked to explain, Plaintiff said Gonzales harassed her by questioning her lateness a week earlier, even though he didn't question the lateness of another co-worker.  (Mazanec Aff. Ex. 9)  Plaintiff admitted that she was late on at least a couple of occasions, (Augustin Tr. 206-07) but acknowledged that she was not docked pay as a consequence of coming late, nor did she claim other adverse consequences as a result of coming in late.  (Augustin Tr. 638-39)

Plaintiff also complained to O'Driscoll that Gonzales gave her extra guests at her station and required her to train new hires.  (Mazanec Aff. Ex. 9; Augustin Tr. 139-147; Def.'s 56.1 Statement ¶ 21)  Plaintiff told O'Driscoll that Gonzales assigned her these additional duties because she had declined to work breakfast and lunch shifts at his request.  (Mazanec Aff. Ex. 9; Def.'s 56.1 Statement ¶ 21)  Plaintiff also testified that Gonzales distributed guests to all of the waiters' tables in a disorganized manner, and that this was a common complaint among all of the waiters.  (Augustin Tr. 147-49; Def.'s 56.1 Statement ¶ 21)

At the July 8, 1997 meeting, Plaintiff also told O'Driscoll that Gonzales's jokes were offensive and upsetting and that, in her presence, he intentionally referred to prosciutto ham as "prostitute ham."  (Mazanec Aff. Ex. 9; Augustin Tr. 191, 231-33; Def.'s 56.1 Statement ¶ 22)  At this meeting, Plaintiff also claimed that she found herself in an altercation with another waiter, Aftab Ali ("Ali"), who grabbed menus out of her hand and told her "you are a stupid waitress."  (Mazanec Aff. Ex. 9; Def.'s 56.1 Statement ¶ 22)

O'Driscoll told Plaintiff he would investigate her claims and he embarked upon an investigation.  (Mazanec Aff. Ex. 9; Def.'s 56.1 Statement ¶¶ 23-24)  Regarding the incident with Ali, the Club took a statement from Ali where he disputed Plaintiff's depiction of the menu incident and described another incident where Plaintiff was rude to him.  (Mazanec Aff. Ex. 10; Def.'s 56.1 Statement ¶ 24)  Ali also stated that on both occasions Plaintiff falsely complained to Gonzales about him.  (Mazanec Aff. Ex. 10; Def.'s 56.1 Statement ¶ 24)  O'Driscoll also interviewed two of Plaintiff's partners, Russell Pinn ("Pinn") and Jose Nieto ("Nieto").  Pinn stated he was partnered with Plaintiff because other waiters did not get along with Plaintiff.  (Mazanec Aff. Ex. 11; Def.'s 56.1 Statement ¶ 25)  Nieto was initially trained by and partnered with Plaintiff.  (Mazanec Aff. Ex. 12; Def.'s 56.1 Statement ¶ 25)  He also found it difficult to work with Plaintiff and requested to work with a different partner.  (Mazanec Aff. Ex. 12; Def.'s 56.1 Statement ¶ 25)  Subsequently, Nieto did not have problems with Plaintiff because he essentially did not speak to her.  (Mazanec Aff. Ex. 12; Def.'s 56.1 Statement ¶ 25)

### 7.  July 10, 1997 Ormston Meeting

On July 10, 1997, Ormston held a meeting with Plaintiff, Gonzales, Dutton, and Joe Luby ("Luby"), a Union business agent, to address Plaintiff's July 8 complaints.  (Mazanec Aff. Ex.

13; Def.'s 56.1 Statement ¶ 26)  At the meeting, the participants reviewed Ali's version of the incident, to which neither Plaintiff nor her Union representative objected.  (Mazanec Aff. Ex. 13; Def.'s 56.1 Statement ¶ 27)  Plaintiff again raised her objection to Gonzales's "proscuitto/prostitute ham" remark and Dutton said he would speak to Gonzales about it. (Mazanec Aff. Ex. 13; Def.'s 56.1 Statement ¶ 27)  In a later meeting, Dutton followed up with Plaintiff and told her he had spoken to Gonzales about the remark.  (Mazanec Aff. Ex. 20; Def.'s 56.1 Statement ¶ 27)  Plaintiff admitted that after she complained about Gonzales's remark it never happened again.  (Augustin Tr. 233; Def.'s 56.1 Statement ¶ 27)

### 8.  July 11, 1997 Sharp Incident

_____The next documented incident between Plaintiff and a co-worker occurred with a bartender named John (a/k/a Jack) Sharp ("Sharp").  Plaintiff claimed that on July 11, 1997, she went to the bar to fill a drink order, and "out of nowhere" Sharp "got upset" and said, "You not a waitress.  Your kind do not belong here.  Your kind belong in the street.  You give us a ticket. Are you a meter maid?  What do you think you are doing here?  Your kind do not belong here. You belong on the street.  That's where you are supposed to be.  How did you get this job here?" (Augustin Tr. 560-61; Def.'s 56.1 Statement ¶ 28)  When Plaintiff initially recounted the incident she claimed Sharp said, "you are not good at being a waitress and you belong in the street," and told her to "fuck off," to which she responded, "fuck you."  (Mazanec Aff. Ex. 14)  Plaintiff concluded this statement was gender-motivated, because she was the only woman working on that floor.  (Augustin Tr. 561-62; Def.'s 56.1 Statement ¶ 28)  Plaintiff also concluded this statement was racially motivated, because a meter maid is a civil servant position mostly filled by "minority black" people.  (Augustin Tr. 707-08; Def.'s 56.1 Statement ¶ 28)

13

Plaintiff brought the alleged Sharp comment to The Yale Club's attention on July 14, 1997, three days after the alleged incident occurred.  (Mazanec Aff. Ex. 14; Def.'s 56.1 Statement ¶ 28)  The Club promptly investigated the incident by taking Plaintiff's complaint, and interviewing Sharp and four other witnesses.  (Mazanec Aff. Exs. 14-19; Def.'s 56.1 Statement ¶ 28)  Sharp admitted telling Plaintiff she was not a waitress, had no manners, and would make a good meter maid, because Plaintiff was very rude when placing her drink order, which he described as her typical demeanor.  (Mazanec Aff. Ex. 15; Def.'s 56.1 Statement ¶ 29)  The witnesses all supported Sharp's version of the incident and confirmed that Sharp's comments were precipitated by Plaintiff's rude disposition when ordering her drinks.  (Mazanec Aff. Exs. 16-19; Def.'s 56.1 Statement ¶ 29)  The witnesses all denied hearing Sharp curse at Plaintiff, and in fact only heard Plaintiff repeatedly cursing.  (Mazanec Aff. Exs. 16-19)

Ormston and Dutton held a meeting on September 4, 1997 with Sharp, Plaintiff, Luby, a Union representative, and Ramiro Vidal ("Vidal") to summarize the results of the Club's investigation into the incident.  (Mazanec Aff. Ex. 20; Def.'s 56.1 Statement ¶ 30)  The Club concluded that both parties were at fault because while Plaintiff started the incident by discourteously pacing her drink orders, Sharp's remarks were still inappropriate.  (Mazanec Aff. Ex. 20; Def.'s 56.1 Statement ¶ 30)  Ormston told Sharp to apologize, which he did.  (Augustin Tr. 571-72; Def.'s 56.1 Statement ¶ 30)  Plaintiff acknowledged that Sharp never again made a similar remark to her, and said that she was satisfied with this resolution.  (Augustin Tr. 561, 571-72; Def.'s 56.1 Statement ¶¶ 28, 30)

During the September 4 meeting, Plaintiff, for the first time, raised additional complaints regarding co-workers.  (Mazanec Aff. Ex. 20; Def.'s 56.1 Statement ¶ 31)  The most serious

claim was that Regaldo previously called her a "black bitch."  (Mazanec Aff. Ex. 20; Def.'s 56.1

Statement ¶ 31)  Both Dutton and Ormston told Plaintiff that in numerous meetings they had

with her regarding other complaints, she had never mentioned Regaldo's statement.  (Mazanec

Aff. Ex. 20)  They also asked her why she had not informed the Union about the comment.

(Mazanec Aff. Ex. 20)  Plaintiff responded that she was told by her Union not to bring it up.

(Mazanec Aff. Ex. 20)  Luby, a Union representative, denied that the Union made any such

statement.  (Mazanec Aff. Ex. 20)  Dutton, as General Manager, concluded by saying that he

would not stand for employees being harassed and the Yale Club immediately commenced an

investigation into the new allegation by interviewing and obtaining statements from the relevant

parties.  (Mazanec Aff. Exs. 20-23; Def.'s 56.1 Statement ¶¶ 31-32)  The statements of the

relevant parties collected during the investigation did not support any of Plaintiff's claims.

(Mazanec Aff. Exs. 21-23; Def.'s 56.1 Statement ¶ 32)

        9.  May-June 1998 Incidents

      In May 1998, Plaintiff brought another complaint to her Union's attention regarding her

co-worker Luovino Collado ("Collado").  After investigating the complaint, the Union

representative concluded that both employees called each other names and both Plaintiff and

Collado agreed to put their grievances behind them and work together in the future with respect

for each other.  (Mazanec Aff. Ex. 24)

      In June 1998, Angela Weiss ("Weiss"), a waiter, brought a complaint about Plaintiff to

the Club's attention.  Weiss told Food and Beverage Director Flynn that on June 29, 1998, Weiss

was assigned as a floating waiter when a guest signaled to her for a request.  (Mazanec Aff. Ex.

25)  While she was taking the guest's order, Plaintiff came up from behind her and took the order

form out of Weiss's hand and pushed her aside.  (Mazanec Aff. Ex. 25)  Weiss also told Flynn

about an incident that occurred on June 25, 1998, where Plaintiff told Weiss's supervisors that

Plaintiff suspected Weiss was mis-charging her guests and taking money away from Plaintiff.

(Mazanec Aff. Ex. 25)  Weiss also complained that, without permission, Plaintiff used a

supervisor number to access the computer to check Weiss's billing record.  (Mazanec Aff. Ex.

25)  The Yale Club investigated the incidents by taking statements from all of the relevant parties

and held a meeting on July 15, 1998 to discuss Weiss's complaint.  (Mazanec Aff. Exs. 25-26)

At the July 15 meeting, Dutton told Weiss and Plaintiff that no disciplinary action would be

taken, but that there should not be any future incidents between them and they should strive to

work together.  (Mazanec Aff. Ex. 26)  After Weiss left the meeting, Dutton and Ormston

discussed with Plaintiff the numerous problems she had getting along with co-workers, as well as

the numerous investigations the Yale Club conducted involving her.  (Mazanec Aff. Ex. 26;

Def.'s 56.1 Statement ¶ 33)  Ormston told Plaintiff that the Club investigated every complaint

Plaintiff brought to their attention and Dutton asked Plaintiff to explain why no other employee

had brought as many complaints as Plaintiff.  (Mazanec Aff. Ex. 26)  Dutton again told Plaintiff

that she needed to learn how to get along with her co-workers and confirmed that Plaintiff had no

additional complaints.  (Mazanec Aff. Ex. 26; Def.'s 56.1 Statement ¶ 33)

### 10.  November 1998 Incident

On November 18, 1998, Plaintiff's supervisor, Gonzales, approached Flynn to complain

that Plaintiff was refusing to work in her assigned team or section.  (Mazanec Aff. Ex. 27; Def.'s

56.1 Statement ¶ 34)  During the lunch service that day, Plaintiff approached Flynn to complain

that Gonzales told her to serve tables that were not her assignment and that she had to work with

slow partners.  (Mazanec Aff. Ex. 27; Augustin Tr. 190-91; Def.'s 56.1 Statement ¶ 34)  Flynn scheduled a meeting with Plaintiff and Gonzales, and Gonzales again approached Flynn the next day to complain that Plaintiff had again refused to work with her assigned partner and had raised her voice about it, in front of other staff.  (Mazanec Aff. Ex. 27; Def.'s 56.1 Statement ¶ 34) Flynn and Ormston held a meeting with Plaintiff and Gonzales about the incidents on November 25, 1998, where both parties were given the opportunity to state their positions.  (Mazanec Aff. Ex. 28; Def.'s 56.1 Statement ¶ 35)  At this meeting, Plaintiff repeatedly interrupted Gonzalez and Ormston and was rude and insubordinate.  (Mazanec Aff. Ex. 28; Def.'s 56.1 Statement ¶ 35)  Plaintiff stated she was no longer going to work lunch in the Tap Room.  (Mazanec Aff. Ex. 28; Def.'s 56.1 Statement ¶ 35)  Ormston told Plaintiff that she could not unilaterally make that decision, and that she should continue to work her assigned shifts until another meeting could be held to discuss it further.  (Mazanec Aff. Ex. 28)

Another meeting was held with Plaintiff on December 17, 1998, to discuss Plaintiff's conduct, as well as her request to stop working in the Tap Room.  (Mazanec Aff. Ex. 29; Def.'s 56.1 Statement ¶ 36)  Ormston, Flynn, Luby, Vidal, Gonzales, and Luis Santiago, a Union delegate for the Tap Room, attended this meeting.  (Mazanec Aff. Ex. 29)  Ormston went through Plaintiff's employment history of nineteen documented incidents with co-workers and/or supervisors dating back to June 1997.  (Mazanec Aff. Ex. 29)  It was explained to her and the union representatives that Plaintiff could not be transferred to another position because there were no other openings at that time.  (Mazanec Aff. Ex. 29; Def.'s 56.1 Statement ¶ 36)  Plaintiff again raised her voice at the meeting and was told that none of her complaints had been substantiated and that she needed to treat her co-workers with respect.  (Mazanec Aff. Ex. 29;

17

Def.'s 56.1 Statement ¶ 36)  Plaintiff was also warned that if there was another meeting in reference to this complaint, disciplinary action would result.  (Mazanec Aff. Ex. 29)

On December 22, 1998, Plaintiff slipped on grease at work and injured herself.  (Augustin Tr. 193-94; Mazanec Aff. ¶ 10; Def.'s 56.1 Statement ¶ 37)  Plaintiff was out of work for approximately three months, during which time Ormston agreed to Plaintiff's request to transfer to a full-time banquet waiter position.  (Augustin Tr. 195, 200-01; Mazanec Aff. ¶ 10; Def.'s 56.1 Statement ¶ 37)  Plaintiff returned to work as a full-time banquet waiter on March 19, 1999, after which she never worked with Gonzales again.  (Mazanec Aff. ¶ 10; Mazanec Aff. Ex. 31; Augustin Tr. 265; Def.'s 56.1 Statement ¶ 38)

### 11.  April 2000 Hannigan Complaint

In April 2000, Plaintiff complained to her supervisor in the banquet department, O'Brien, that Hannigan, one of her captains, treated her rudely, brought his personal issues to work, and had made negative remarks about women.  (Mazanec Aff. Ex. 32; Def.'s 56.1 Statement ¶ 41)  Yet, Plaintiff testified in her deposition that Hannigan did a good job and was fair in supervising the employees, including Plaintiff.  (Augustin Tr. 293-94; Def.'s 56.1 Statement ¶ 41)  O'Brien investigated Plaintiff's complaints and concluded they were unfounded and memorialized this in an April 13, 2000 memorandum to Ormston.  (Mazanec Aff. Ex. 32; Def.'s 56.1 Statement ¶ 41)

### 12.  November 15, 2000 Incident

On November 15, 2000, Plaintiff walked off the job during a function.  (Mazanec Aff. Ex. 33; Def.'s 56.1 Statement ¶ 41)  O'Brien brought this to Mazanec's attention, and Mazanec held a meeting on November 17, 2000 to address the situation with Plaintiff.  (Mazanec Aff. Ex. 33; Mazanec Aff. ¶ 13; Def.'s 56.1 Statement ¶ 42)  Plaintiff claimed Hannigan pushed or threw

a bag of bread at her, which prompted her to leave.  (Augustin Tr. 322, 641-43; Mazanec Aff. Ex. 33; Mazanec Aff. ¶ 13; Def.'s 56.1 Statement ¶ 42)  Despite Plaintiff's long history of bringing complaints to management's attention, Plaintiff did not raise this complaint until Mazanec questioned her about leaving the event early.  (Mazanec Aff. Ex. 33; Mazanec Aff. ¶ 13; Def.'s 56.1 Statement ¶ 42)  In response, Mazanec informed Plaintiff of the Club's harassment-free workplace policy, told her that he would investigate her claim, and that any future problems with Hannigan should be reported to Plaintiff's supervisor, O'Brien, Mazanec, or Dutton, the General Manager.  (Augustin Tr. 320-21; Mazanec Aff. Ex. 33; Mazanec Aff. ¶ 13; Def.'s 56.1 Statement ¶ 42)

Mazanec spoke to Hannigan, the only other witness to the event, and he denied doing anything other than handing Plaintiff a bag of bread.  (Mazanec Aff. ¶ 13; Mazanec Aff. Ex. 33; Def.'s 56.1 Statement ¶ 42)  Mazanec told Plaintiff that since it was her word against Hannigan's, Mazanec could do no more than document the complaint.  (Mazanec Aff. ¶ 13; Mazanec Aff. Ex. 33; Def.'s 56.1 Statement ¶ 42)  He also reminded Plaintiff that she could not leave during her shift without informing a manager and that the Yale Club takes allegations of harassment seriously, so she should report any future problems.  (Mazanec Aff. ¶ 13; Mazanec Aff. Ex. 33; Def.'s 56.1 Statement ¶ 42)  Plaintiff acknowledged that after Mazanec investigated the incident, Hannigan never engaged in this type of alleged conduct again.  (Augustin Tr. 642; Def.'s 56.1 Statement ¶ 42)

### 13.  March 19, 2001 Incident

On March 19, 2001, Plaintiff was ascending a staircase at the Yale Club.  At the top of the staircase were two co-workers:  Wayne Li ("Li"), a waiter, and Hannigan.  (Augutin Tr. 274-

75; Mazanec Aff. Ex. 34; Def.'s 56.1 Statement ¶ 43)  Both Li and Hannigan (whom Plaintiff

considered a truthful person) said they were on the staircase when Plaintiff came up the stairs,

stopped between them, raised her leg and stomped down on Li's foot.  (Augutin Tr. 292;

Mazanec Aff. ¶ 14; Mazanec Aff. Ex. 34; Def.'s 56.1 Statement ¶¶ 43, 45)  Li shouted and

pushed Plaintiff away.  (Mazanec Aff. ¶ 14; Mazanec Aff. Ex. 34; Def.'s 56.1 Statement ¶¶ 43,

45)  Plaintiff, on the other hand, testified that without provocation, Li "called her a name" when

she reached the top of the stairs and then pushed her.  (Augustin Tr. 275-77)

The next day, March 20, 2001, Li complained to Mazanec about the incident and as a

result, Mazanec initiated an investigation.  (Mazanec Aff. ¶¶ 14-16; Mazanec Aff. Exs. 34-35)

Plaintiff did not raise a complaint about the incident until she became aware that the Club had

begun an investigation at Li's request.  (Mazanec Aff. Ex. 35)  Plaintiff's initial statement, made

nine days after the incident, differs widely from her deposition testimony.  As recorded in

Mazanec's account of his meeting with Plaintiff and others, held on March 29, 2001, Plaintiff

told Mazanec, with her union delegate present, that Li told Plaintiff, "I'm not moving.  If you

want to pass, you have to go through that little spot," and claimed the whole incident was a set-

up between Li and Hannigan to injure Plaintiff.  (Mazanec Aff. ¶ 15; Mazanec Aff. Ex. 35;

Def.'s 56.1 Statement ¶ 46)  When asked by Mazanec why Li would push her, Plaintiff

responded "for no reason."  (Mazanec Aff. ¶ 15; Mazanec Aff. Ex. 35)  This was the first time

Plaintiff claimed to anyone in management at the Club that Li had pushed her without

provocation.  (Mazanec Aff. ¶ 15, Mazanec Aff. Ex. 35; Def.'s 56.1 Statement ¶ 46)  Also, for

the first time at this meeting, she alleged that Li injured her.

As a result of his investigation, Mazanec determined that both Li and Plaintiff were at

fault.  (Mazanec Aff. ¶¶ 17-18; Mazanec Aff. Ex. ¶ 35; Def.'s 56.1 Statement ¶ 47)  First, he

concluded that Plaintiff stomped on Li's foot without provocation, as stated by Li and

corroborated by Hannigan, and that his visual inspection of the area did not support Plaintiff's

version of the events.  (Mazanec Aff. ¶¶ 16-17, Mazanec Aff. Exs. 35-36; Def.'s 56.1 Statement

¶ 47)  Second, Mazanec determined Plaintiff's failure to complain about or allege any injury until

ten days after the incident occurred, when she was called to his office regrading Li's complaint,

also did not support Plaintiff's version of what happened.  (Mazanec Aff. ¶¶ 7; Mazanec Aff.

Exs. 35)  Third, Mazanec also concluded that even if it was an instinctive reaction, Li's response

was inappropriate because serious injury to Plaintiff could have resulted from pushing her,

especially at the top of stairs.  (Mazanec Aff. ¶ 18, Mazanec Aff. Exs. 35, 37; Def.'s 56.1

Statement ¶ 47)

       Mazanec and Dutton determined that each employee should receive a three-day

suspension.  (Mazanec Aff. ¶¶ 17-18, Mazanec Aff. Exs. 35-37; Def.'s 56.1 Statement ¶ 48)  Li's

dangerous response, although determined by the Club to be an automatic reaction to Plaintiff's

actions, merited his suspension as well as a written warning.  (Mazanec Aff. ¶ 18; Mazanec Aff.

Ex. 37; Def.'s 56.1 Statement ¶ 48)  Because Li's conduct was provoked, the Club's warning was

not a "final" warning.  (Mazanec Aff. ¶ 18; Mazanec Aff. Ex. 37; Def.'s 56.1 Statement ¶ 48)

The Club concluded that Plaintiff initiated the incident by stomping on Li's foot without

provocation, therefore, in addition to her three-day suspension, Plaintiff was also issued a final

written warning, dated April 2, 2001.  (Mazanec Aff. ¶ 17; Mazanec Aff. Ex. 36; Def.'s 56.1

Statement ¶ 48)  Plaintiff's final warning stated that "should another incident of similar nature

occur, your employment will be terminated."  (Mazanec Aff. ¶ 17; Mazanec Aff. Ex. 36; Def.'s

56.1 Statement ¶ 48)  Both Plaintiff and her Union received the April 2 written warning and never arbitrated the disciplinary measures.  (Augustin Tr. 331-33, 342-43; Mazanec Aff. ¶ 20; Def.'s 56.1 Statement ¶ 48)  On April 10, 2001, Mazanec and Dutton held a meeting with, among others, Li, Plaintiff, and Luby, the Union Business Agent, to discuss the disciplinary actions taken.  (Mazanec Aff. ¶ 19; Mazanec Aff. Ex. 39)  Luby requested the suspensions be revoked, a request the Club formally denied via a letter to Luby dated June 26, 2001.[4]   (Mazanec Aff. ¶¶ 19-20; Mazanec Aff. Exs. 39-41; Def.'s 56.1 Statement ¶ 48)

### 14.  January 2002 Incidents

On January 29, 2002, Plaintiff informed Mazanec that she wanted to file a harassment complaint against her co-worker, Miguel Lopez ("Lopez").  (Mazanec Aff. ¶ 21; Mazanec Aff. Ex. 42; Def.'s 56.1 Statement ¶ 49)  Mazanec convened a meeting for January 30, 2002, with Plaintiff and her Union delegate Vidal, which was memorialized in writing.  (Mazanec Aff. ¶ 22; Mazanec Aff. Ex. 43; Def.'s 56.1 Statement ¶ 49)  At the January 30 meeting, Plaintiff lodged complaints about four incidents.  First, she complained about an incident with two co-workers, Alba Sanchez ("Sanchez") and Lopez, that allegedly occurred approximately fifteen months prior to the meeting.[5]  Plaintiff claimed that in October 2000, Sanchez hit her on the shoulder with a

---

[4] Plaintiff claimed at her deposition that the Club agreed to rescind the three-day suspension for the incident, yet she admitted that she (i) never saw anything in writing about such a rescission; (ii) was never compensated for the three-day suspension she received; and (iii) never inquired about the lack of reimbursement for those three days.  (Augustin Tr. 342-47; Def.'s 56.1 Statement ¶ 48)  Moreover, all of the Yale Club documentation, including a letter sent by Mazanec to the Union almost a year after the incident, (Mazanec Aff. Exs. 39-41, 46) confirms the disciplinary action was never rescinded.  (Def.'s 56.1 Statement ¶ 48)

[5] Plaintiff never filed a contemporaneous complaint about this incident or filed an accident or injury report.  (Mazanec Aff. ¶ 22; Def.'s 56.1 Statement ¶ 49)

water pitcher and that Lopez told her "You're garbage here.  Who are you?  You're nothing.

You're nobody.  I don't like you.  Working with you is a waste of my time."  (Mazanec Aff. ¶ 22;

Mazanec Aff. Ex. 43; Def.'s 56.1 Statement ¶ 49)  Second, Plaintiff complained that various co-

workers had told several captains they did not want to work with her.  (Mazanec Aff. ¶ 22;

Mazanec Aff. Ex. 43; Def.'s 56.1 Statement ¶ 49)  Third, Plaintiff claimed that on January 28,

2002, she had just brought back salads into the kitchen when Lopez approached her from behind

and banged his serving tray, cursed at her in Spanish, called her a "fucking negrita," and said he

would report her to Human Resources.  (Mazanec Aff. ¶ 22; Mazanec Aff. Ex. 43; Def.'s 56.1

Statement ¶ 49)  Fourth, Plaintiff stated that on January 29, 2002, Vidal approached her to talk

about a problem concerning Plaintiff expressed by Lopez that he was considering bringing to

management's attention.  (Mazanec Aff. ¶ 22; Mazanec Aff. Ex. 43; Def.'s 56.1 Statement ¶ 49)

Plaintiff told Vidal to deal with Lopez because she wanted nothing to do with him.  (Mazanec

Aff. ¶ 22; Mazanec Aff. Ex. 43; Def.'s 56.1 Statement ¶ 49)  Finally, Plaintiff made wide-

ranging accusations against Hannigan, claiming that he favors the male, Spanish employees, that

he is a racist, and hates all women.  (Mazanec Aff. Ex. 43)  Again, Mazanec informed Plaintiff

that he would conduct a full investigation and that the Yale Club takes such complaints very

seriously.  (Mazanec Aff. ¶ 22; Mazanec Aff. Ex. 43; Def.'s 56.1 Statement ¶ 49)

Mazanec conducted a through investigation, interviewing seven employees (including

disinterested witnesses) with Plaintiff's union representative present, about Plaintiff's complaints

and memorializing their statements in writing.  (Mazanec Aff. ¶ 23; Mazanec Aff. Ex. 44; Def.'s

56.1 Statement ¶ 50)  Plaintiff's version of the events vastly differed from the consistent

statements of the seven other employee witnesses.  (Mazanec Aff. ¶ 23; Mazanec Aff. Ex. 44;

Def.'s 56.1 Statement ¶ 50)  The witnesses all agreed that at a banquet function on January 28, 2002, Lopez needed two more salads for his table, saw that Plaintiff had two extra salads that she was returning to the kitchen, and asked Miguel Sinchi ("Sinchi"), Plaintiff's partner, to ask Plaintiff for the extra salads.  (Mazanec Aff. ¶ 23; Mazanec Aff. Ex. 44; Def.'s 56.1 Statement ¶ 50)  Sinchi asked Plaintiff for the extra salads, but Plaintiff ignored the request by slowly walking back into the kitchen singing.  (Mazanec Aff. ¶ 23; Mazanec Aff. Ex. 44; Def.'s 56.1 Statement ¶ 50)  None of the witnesses heard Lopez curse at Plaintiff, and Lopez specifically denied doing so.  (Mazanec Aff. ¶ 23; Mazanec Aff. Ex. 44; Def.'s 56.1 Statement ¶ 50)

The next day, January 29, 2002, Lopez spoke with Vidal, a shop steward, about the incident.  (Mazanec Aff. ¶¶ 23-24; Mazanec Aff. Ex. 44; Def.'s 56.1 Statement ¶ 51)  Vidal tried to speak with Plaintiff about the incident, but she refused, shouting she wanted nothing further to do with Lopez and that Vidal could deal with him.  (Mazanec Aff. Ex. 44; Augustin Tr. 392; Def.'s 56.1 Statement ¶ 51)  Plaintiff then began yelling at Lopez, Sanchez, and Fernando Tayo ("Tayo"), all fellow waiters, calling them "damn dogs" and "ignorant" and threatening "I'm going to take you to court, you don't know who you are dealing with."  (Mazanec Aff. ¶ 24; Mazanec Aff. Ex. 44; Def.'s 56.1 Statement ¶ 51)

On March 4, 2002, Mazanec and Dutton, along with Local 6 Union representatives, Vidal and Keith Armstrong ("Armstrong"), met with Plaintiff to discuss the investigation.  (Mazanec Aff. ¶ 25; Mazanec Aff. Ex. 45; Def.'s 56.1 Statement ¶ 52)  Plaintiff denied calling any employees "damn dogs." (Augustin Tr. 379-81, 397-98; Def.'s 56.1 Statement ¶ 52)  During the March 4 meeting, Plaintiff again raised new and general complaints regarding alleged race or gender discrimination.  (Mazanec Aff. ¶ 25; Mazanec Aff. Ex. 45; Def.'s 56.1 Statement ¶ 52)

24

She also again claimed that Hannigan was harassing her, but even upon request, would not elaborate further.  (Mazanec Aff. ¶ 25; Mazanec Aff. Ex. 45; Def.'s 56.1 Statement ¶ 52)  She also raised some pay issues and was told that the Yale Club hires based on seniority and promotion from within the Club.  (Mazanec Aff. ¶ 25; Mazanec Aff. Ex. 45; Def.'s 56.1 Statement ¶ 52)  Plaintiff was again reminded that she needed to treat people with more respect and the Club reiterated its policy against discrimination and harassment, and agreed to have a follow-up meeting.  (Mazanec Aff. ¶ 25; Mazanec Aff. Ex. 45; Def.'s 56.1 Statement ¶ 52)  By a letter dated March 13, 2002 sent to the Union, Mazanec responded in writing to the issues raised by Plaintiff in the March 4 meeting.  (Mazanec Aff. ¶ 26; Mazanec Aff. Ex. 46; Def.'s 56.1 Statement ¶ 53)  The letter reminded the Union of the Club's anti-harassment and anti-discrimination and hiring policies, concluded Plaintiff's earlier suspension for the Li incident was warranted, and included a summary of Plaintiff's nineteen prior incidents with her co-workers (not including the most recent incident).  (Mazanec Aff. ¶ 26; Mazanec Aff. Ex. 46; Def.'s 56.1 Statement ¶ 53)

### 15.  March 26, 2002 Complaint

Mazanec and Dutton were approached on March 26, 2002 by a couple of banquet waiters to discuss continuing problems with Plaintiff.  (Mazanec Aff. ¶ 27; Mazanec Aff. Ex. 47; Def.'s 56.1 Statement ¶ 54)  They complained that Plaintiff was disrespectful, insulting, and difficult to work with, and asked the Club to take some action to rectify the situation.  (Mazanec Aff. ¶ 27; Mazanec Aff. Ex. 47; Def.'s 56.1 Statement ¶ 54)  Dutton told the waiters that no one is favored and everyone is treated equally and fairly.  (Mazanec Aff. ¶ 27; Mazanec Aff. Ex. 47; Def.'s 56.1 Statement ¶ 54)  He also explained that there was a meeting scheduled regarding new Banquet

Department Standards of Service to make sure everyone adhered to the proper rules.  (Mazanec Aff. ¶ 27; Mazanec Aff. Ex. 47; Def.'s 56.1 Statement ¶ 54)

Mazanec met again with Plaintiff on April 12, 2002 to specifically discuss the pay issues Plaintiff raised, which were unrelated to any complaints of discrimination or harassment, and memorialized and followed up on the discussion in a letter to the Union the same day.  (Mazanec Aff. ¶¶ 29-30; Mazanec Aff. Ex. 48; Def.'s 56.1 Statement ¶ 55)  Mazanec invited the Union to call if they had any problems with the way these issues were resolved, but the Union never contacted the Yale Club about these issues.  (Mazanec Aff. ¶ 30; Mazanec Aff. Ex. 48; Def.'s 56.1 Statement ¶ 55)

### 16.  April 16, 2002 Complaint

On April 16, 2002, Plaintiff complained to Mazanec about a conversation she allegedly overheard between Hannigan and Li on April 12, 2002.  (Augustin Tr. 888; Mazanec Aff. ¶ 31; Mazanec Aff. Ex. 49; Def.'s 56.1 Statement ¶ 56)  She claimed they were plotting to have Hannigan push her while Li took a picture.  (Augustin Tr. 879-81; Mazanec Aff. ¶ 31; Mazanec Aff. Ex. 49; Def.'s 56.1 Statement ¶ 56)  Plaintiff claimed this incident meant her "life was threatened."  (Augustin Tr. 879-81; Mazanec Aff. ¶ 31; Mazanec Aff. Ex. 49; Def.'s 56.1 Statement ¶ 56)  Mazanec advised Plaintiff that he would bring the matter to the attention of O'Brien and would investigate the matter.  (Mazanec Aff. ¶ 31; Mazanec Aff. Ex. 49)  In the subsequent investigation, both Hannigan and Li denied Plaintiff's accusations and stated that they felt harassed by her.  (Mazanec Aff. ¶ 32; Mazanec Aff. Exs. 50-51; Def.'s 56.1 Statement ¶ 56)  After completing its investigation, the Yale Club concluded that Plaintiff's complaint was unsubstantiated and illogical as to why anyone would want to photograph, and thus record, a

deliberate attempt to injure her.  (Mazanec Aff. ¶ 32; Mazanec Aff. Ex. 54; Def.'s 56.1 Statement ¶ 56)

               17.  April 26, 2002 Final Warning

After receiving the various complaints by and against Plaintiff over the course of several months and having had the opportunity to fully investigate them, Mazanec, in conjunction with Dutton, on behalf of the Club, issued a new final warning to Plaintiff dated April 26, 2002. (Mazanec Aff. ¶¶ 33-34; Mazanec Aff. Ex. 53; Def.'s 56.1 Statement ¶ 57)  That final warning concluded:  (1) Plaintiff's complaint regarding Sanchez and Lopez was far too remote to warrant action;[6] (2) it was not misconduct for employees to tell a supervisor they do not want to work with a particular individual, a concept Plaintiff agreed with at her deposition (Augustin Tr. 281); and (3) it was Plaintiff who acted inappropriately by ignoring Lopez's and Sinchi's request for her extra salads, refusing to try and resolve the matter through her union delegate, and calling fellow employees "dogs" and "damn dogs."  (Mazanec Aff. ¶¶ 33-34; Mazanec Aff. Ex. 53; Def.'s 56.1 Statement ¶ 57)  Although Plaintiff was already on final warning for similar conduct, namely her inability to get along with her co-workers, the Yale Club chose to issue her another final warning and gave her one last chance.  (Mazanec Aff. ¶¶ 33-34; Mazanec Aff. Ex. 53; Def.'s 56.1 Statement ¶ 57)  In this final warning, Mazanec reminded Plaintiff she had been repeatedly counseled regarding her need to improve her working relationship with her co-workers, but instead continued to antagonize them.  (Mazanec Aff. ¶¶ 33-34; Mazanec Aff. Ex. 53; Def.'s 56.1 Statement ¶ 57)  This final warning specifically informed Plaintiff "that any

---

[6] The warning noted that it took over sixteen months for Plaintiff to report the alleged incident while, in the intervening months, she brought numerous complaints about fellow employees.  (Mazanec Aff. Ex. 53)

further altercations, arguments, or other problems in your relationship with your co-workers will result in your termination."  (Mazanec Aff. ¶¶ 33-34; Mazanec Aff. Ex. 53; Def.'s 56.1 Statement ¶ 57)

Mazanec and Dutton presented the written final warning to Plaintiff and her Union representative, Keith Armstrong, at a meeting on April 30, 2002, a description of which was memorialized by the Club.  (Mazanec Aff. ¶ 35; Mazanec Aff. Exs. 53-54; Def.'s 56.1 Statement ¶ 58)  Although the Union representative stated during the meeting that the Union did not accept the new final warning as a final warning, this final warning was never grieved or arbitrated by the union, as required under the CBA.  (Mazanec Aff. ¶ 35; Mazanec Aff. Exs. 54; Def.'s 56.1 Statement ¶ 58)

Plaintiff testified that she and Lopez eventually made up after the salad incident, when he allegedly called her a "fucking negrita," and they were friends thereafter.  (Augustin Tr. 372-73, 391-92; Def.'s 56.1 Statement ¶ 59)  Plaintiff also subsequently testified that Lopez was a "teddy bear" and a "nice man," although somewhat "hot-tempered."  (Augustin Tr. 357-59; Def.'s 56.1 Statement ¶ 59)

### 18.  June 8, 2002 Incident

On Saturday June 8, 2002, approximately six weeks after Plaintiff received her second final warning, Plaintiff was working as a banquet waitress for a wedding reception on the Club's twentieth floor.  (Augustin Tr. 416; Def.'s 56.1 Statement ¶ 60)  Approximately 300 guests attended the reception.  (Augustin Tr. 435; Def.'s 56.1 Statement ¶ 60)  During the dinner, one of Plaintiff's co-workers, Martha Leyva ("Leyva"), was given a drink order by a guest at one of Plaintiff's tables and proceeded to get the order.  (Augustin Tr. 421-22; Krebs Decl. Ex. G 4;

28

Def.'s 56.1 Statement ¶ 60)  After several minutes, Plaintiff went to check on the drink order,

because it was her table.  (Augustin Tr. 422; Def.'s 56.1 Statement ¶ 60)  After this point,

Plaintiff's version of the events is drastically different than that of all the other participants and

witnesses.

Leyva explained that she was at the bar on the back landing behind the kitchen trying to

fill the guest's drink order when Plaintiff approached screaming that she had the drink order.

(Mazanec Aff. Ex. 55; Def.'s 56.1 Statement ¶ 61)  Leyva said that was fine and began to walk

away while sarcastically saying, "you're welcome," to Plaintiff, because Plaintiff never said

thank you.  (Krebs Decl. Ex. L 5; Def.'s 56.1 Statement ¶ 61)  Plaintiff began screaming curses at

Leyva, including "that fucking bitch," and "what the fuck is wrong with that bitch," while Leyva

walked through the kitchen to go back to the ballroom.  (Mazanec Aff. Exs. 55, 60-64; Def.'s

56.1 Statement ¶ 61)  Plaintiff continued cursing and screaming after she left the kitchen.  (Krebs

Decl. Ex. J 89-92; Mazanec Aff. Exs. 55, 60-64; Def.'s 56.1 Statement ¶ 61)

Plaintiff maintains that when she went into the kitchen to check on the drink order, she

saw Leyva standing with co-worker Alfredo Zapata ("Zapata"), who was holding Leyva's wrists

and moving her arms up and down in repetitive "cat clawing" motions.  (Augustin Tr. 422-23;

Krebs Decl. Ex. G 5; Mazanec Aff. Ex. 56; Def.'s 56.1 Statement ¶ 62)  Both women then went

to the bar on the back landing, where Plaintiff said she would handle the order.  (Augustin Tr.

423; Mazanec Aff. Ex. 56; Def.'s 56.1 Statement ¶ 62)  When Leyva left the back landing, she

turned around and began cursing Plaintiff.  (Augustin Tr. 423; Mazanec Aff. Ex. 56; Def.'s 56.1

Statement ¶ 62)  Initially, Plaintiff could not hear what Leyva was saying, but could see from

Leyva's facial expression that she was angry, so Plaintiff walked up to Leyva and asked her what

she said.  (Augustin Tr. 423-24, 431; Mazanec Aff. Ex. 56; Def.'s 56.1 Statement ¶ 62)  Plaintiff

claims that she then heard Leyva curse at her and call her a "fucking bitch" once and later

remembered that Leyva also called her a "whore."  (Augustin Tr. 424, 432-33, 649; Def.'s 56.1

Statement ¶ 62)  After Leyva finished cursing, Plaintiff maintains Leyva walked away while

Plaintiff went back to the bar to get the drink order.  (Augustin Tr. 424; Def.'s 56.1 Statement ¶

62)

According to Plaintiff, when she brought the drinks back to her table, the guest who

requested the drinks was not there, although she acknowledged that there were guests seated at

the surrounding tables.  (Augustin Tr. 424, 435-36; Def.'s 56.1 Statement ¶ 63)  As she

approached the table, but before she put the drink tray down, she saw Leyva standing by the chair

of the guest who requested the drinks.  (Augustin Tr. 424, 438-39; Mazanec Aff. Ex. 56; Def.'s

56.1 Statement ¶ 63)  Plaintiff then heard a voice say, "Stop, don't move."  (Augustin Tr. 424,

439; Mazanec Aff. Ex. 56; Def.'s 56.1 Statement ¶ 63)  At the time, Plaintiff did not recognize

the voice, but claimed that she has since learned it belonged to another waiter, Rosa Marte

("Marte").  (Augustin Tr. 439; Mazanec Aff. Ex. 56; Def.'s 56.1 Statement ¶ 63)  Plaintiff then

saw Marte jump in front of her, and at the same time saw Leyva coming at her with her hands

outstretched in claw-like positions, making cat-clawing motions and a growling sound, trying to

scratch Plaintiff.[7]  (Augustin Tr. 424-25, 443, 465; Mazanec Aff. Ex. 56; Def.'s 56.1 Statement ¶

63)  Marte placed herself in between Plaintiff and Leyva in order to prevent Leyva from making

_____

[7] At her workers' compensation hearing, Plaintiff claimed Leyva cursed at her in English
and Spanish during the alleged attack, yet during her deposition, Plaintiff said that Leyva did not
speak during the alleged attack, but only made "growling" sounds.  (Krebs Decl. Ex. G 7;
Augustin Tr. 443, 465)

contact with Plaintiff and kept pushing Leyva away, but Leyva kept attempting to make contact with Plaintiff.  (Augustin Tr. 424-25; Krebs Decl. Ex. G 6; Mazanec Aff. Ex. 56; Def.'s 56.1 Statement ¶ 63)  Eventually, Plaintiff maintains, Marte was able to push Leyva all the way across the "completely empty" dance floor to the other side of the banquet hall.  (Augustin Tr. 425, 436, 448; Krebs Decl. Ex. G 6; Def.'s 56.1 Statement ¶ 63)

Plaintiff claimed the entire incident lasted approximately one minute.  (Augustin Tr. 444; Def.'s Statement ¶ 64)  During the entire time of the incident in the banquet hall, Plaintiff did not say anything, including telling Leyva to stop.  (Augustin Tr. 444-45; Def.'s Statement ¶ 64) Instead, during the alleged attack, Plaintiff stated she moved her head and shoulders back and forth to get out of the way of Leyva who was charging at her, all the while holding on to her drinks.  (Augustin Tr. 424, 450-52; Krebs Decl. Ex. G 6; Def.'s Statement ¶ 64)  During the alleged attack, Plaintiff said she did not attempt to back away, turn around and walk away, or walk to the side, rather, according to Plaintiff, her feet "froze," but her upper body was able to move to get out Leyva's way.  (Augustin Tr. 424, 450-52; Krebs Decl. Ex. G 6; Def.'s Statement ¶ 64)  Plaintiff insisted that none of the 300 guests got up to help her during the alleged attack or ask her afterwards if she had been harmed.  (Augustin Tr. 446-48; Def.'s Statement ¶ 64) Plaintiff was also not aware of any complaints by any of the guests or members of the wedding party regarding the incident and the Yale Club never received any such complaints.  (Augustin Tr. 449; Mazanec Aff. ¶ 39; Def.'s 56.1 Statement ¶ 64)  Immediately after this alleged attack occurred, Plaintiff said she put down her drinks, which she had held onto throughout the entire incident, and continued working by picking up some dirty plates and glasses on her table and bringing them back into the kitchen.  (Augustin Tr. 424-25, 452; Def.'s 56.1 Statement ¶ 65)

31

Once Plaintiff returned to the kitchen, she claimed she saw Zapata laughing, and it "just hit [her]" that what happened earlier between Zapata and Leyva was connected to the alleged attack on the dance floor.  (Augustin Tr. 425-26; Def.'s 56.1 Statement ¶ 66)  As a result, Plaintiff maintained, she began screaming in the kitchen, "Oh, my God.  I don't believe this.  I don't believe this happened to me.  How can this woman, how can she do this to me;" "First she called me a fucking bitch and now she did this to me."  (Augustin Tr. 426, 453-54; Def.'s 56.1 Statement ¶ 66)  Plaintiff stated she continued working for approximately five to ten minutes after she finished screaming in the kitchen.  (Augustin Tr. 456; Def.'s 56.1 Statement ¶ 67)  Plaintiff then claimed she sought out the captain, Charles Garcia, and told him that Leyva attacked her verbally on the back landing and once physically in the ballroom.  (Augustin Tr. 427-29, 460-61; Def.'s 56.1 Statement ¶ 67)  Dutton came into the kitchen and spoke with several employees.  (Augustin Tr. 429; Def.'s 56.1 Statement ¶ 67)  There were no further incidents between Plaintiff and Leyva and Plaintiff finished her work that evening and went home.  (Augustin Tr. 463, 469; Def.'s 56.1 Statement ¶ 67)

On Monday, June 10, 2002, Leyva went to Mazanec to register a formal complaint against Plaintiff for her verbal abuse of Leyva on the back landing – that complaint was memorialized in writing and signed by Leyva.  (Mazanec Aff. ¶ 36; Mazanec Aff. Ex. 55; Def.'s 56.1 Statement ¶ 68)  Mazanec then initiated an investigation.  (Mazanec Aff. ¶ 37; Def.'s 56.1 Statement ¶ 68)  Mazanec's first interview was with Plaintiff on June 17, 2002.  (Mazanec Aff. ¶ 37; Mazanec Aff. Ex. 56; Def.'s 56.1 Statement ¶ 68)  Prior to Mazanec's request to interview Plaintiff, despite working a regular schedule between June 8 and the June 17 meeting, had not approached anyone in management about the incident, nor did she register a formal complaint

regarding the incident.  (Augustin Tr. 484, 489-91; Mazanec Aff. ¶ 37; Def.'s 56.1 Statement ¶ 68)  Plaintiff had a union delegate, Angel Rodriguez, present for the meeting.  (Augustin Tr. 484-85, 809; Mazanec Aff. Ex. 56; Def.'s 56.1 Statement ¶ 68)  Mazanec explained to Plaintiff that Leyva had filed a report against her for verbal abuse and Plaintiff gave Mazanec a verbal statement of what she claimed occurred on June 8.  (Augustin Tr. 486, 488-89; Mazanec Aff. ¶ 37; Def.'s 56.1 Statement ¶ 68)  Within a few days after this meeting, Mazanec gave Plaintiff a typed version of her statement and asked Plaintiff to review and sign the statement if she agreed with its contents.  (Augustin Tr. 491-93; Mazanec Aff. ¶ 37; Mazanec Aff. Ex. 56; Def.'s 56.1 Statement ¶ 69)  Plaintiff read the statement carefully and made extensive handwritten changes and additions to the text and then signed it.  (Augustin Tr. 495-96; Mazanec Aff. ¶ 37; Mazanec Aff. Ex. 56; Def.'s 56.1 Statement ¶ 69)  Plaintiff was careful to include in her signed statement everything she thought was important.  (Augustin Tr. 497; Def.'s 56.1 Statement ¶ 69)  Plaintiff maintained her regular schedule after the incident.  (Augustin Tr. 497; Def.'s 56.1 Statement ¶ 69)

In the course of his investigation, Mazanec interviewed nine employees, besides Leyva and Plaintiff, including Marte, Julio Huallpacuna ("Huallpacuna") (the bartender on the back landing the night of the incident), Garcia, and Zapata, obtaining signed statements from each of them.  (Mazanec Aff. ¶ 38; Mazanec Aff. Exs. 57-65; Def.'s 56.1 Statement ¶ 70)  All of the witnesses interviewed by Mazanec corroborated Leyva's complaint and disputed Plaintiff's version of the incident.[8]  (Mazanec Aff. Exs. 57-65; Def.'s 56.1 Statement ¶ 70)  Marte heard

---

[8] Plaintiff also said that a security video of the bar area would support her version of the events surrounding her claim that she was verbally assaulted by Plaintiff.  (Mazanec Aff. Ex. 56) Dutton reviewed the tape and concluded that it did not reveal any inappropriate conduct by Leyva

Plaintiff making a commotion on the back landing, but never heard Leyva curse and said she never needed to intercede in the ballroom to break up any alleged attack by Leyva against Plaintiff.  (Mazanec Aff. Ex. 57; Def.'s 56.1 Statement ¶ 70)  Joydeb Saha, Plaintiff's partner that evening, saw that Plaintiff was upset at one point in the evening, but observed no altercation between Plaintiff and Leyva.  (Mazanec Aff. Ex. 58; Def.'s 56.1 Statement ¶ 70)  Garcia acknowledged he received a complaint from Plaintiff that evening that she was displeased with how Leyva spoke to her about a drink order, but Plaintiff never said anything about an assault or attack.  (Mazanec Aff. Ex. 59; Def.'s 56.1 Statement ¶ 70)  Zapata denied showing Leyva how to make cat-claws or suggested that she attack Plaintiff.  (Mazanec Aff. Ex. 60; Def.'s 56.1 Statement ¶ 70)  Zapata also heard Plaintiff cursing in the kitchen area, saying, "what the f--- is wrong with that bitch."  (Mazanec Aff. Ex. 60; Def.'s 56.1 Statement ¶ 70)  Both Sinchi and Sanchez heard Plaintiff in the kitchen cursing loudly saying "mother f---er" and "f--k" repeatedly and Sinchi did not witness any incident between Plaintiff and Leyva in the dining area. (Mazanec Aff. Exs. 61-62; Def.'s 56.1 Statement ¶ 70)  Huallpacuna saw Leyva come to the bar followed closely by Plaintiff.  (Mazanec Aff. Ex. 65; Def.'s 56.1 Statement ¶ 70)  Huallpacuna stated that Plaintiff expressed anger at Leyva taking her drink order while saying, "Who does that crazy mother f--ker woman think she is.  I'm going to go to Charles."  (Mazanec Aff. Ex. 65; Def.'s 56.1 Statement ¶ 70)  Huallpacuna did not mention any use of profanity by Leyva. (Mazanec Aff. Ex. 65; Def.'s 56.1 Statement ¶ 70)

### 19.  Plaintiff's Termination

After reviewing all of the evidence, the Yale Club concluded that Leyva's complaint

---

towards Plaintiff.  (Mazanec Aff. Ex. 67)

concerning the June 8, 2002 incident was substantiated and Plaintiff's complaint was meritless. (Mazanec Aff. ¶ 40; Def.'s 56.1 Statement ¶ 71)  In light of Plaintiff's double final warning, the last warning given merely six weeks before the June 8 incident, the Club determined Plaintiff did not merit any further chances and that her conduct on June 8 warranted terminating her employment.  (Mazanec Aff. ¶ 40; Def.'s 56.1 Statement ¶ 71)

Prior to informing Plaintiff of her termination, Mazanec notified her Union of the Club's intentions.  (Krebs Decl. Ex. K 202-03; Mazanec Aff. ¶ 41; Def.'s 56.1 Statement ¶ 72) Armstrong, the Union business agent, requested all of the investigative documents and further requested that the Club not terminate Plaintiff until the Union had the opportunity to review the documents.  (Krebs Decl. Ex. K 202-03; Mazanec Aff. ¶ 41; Def.'s 56.1 Statement ¶ 72)  The Club decided to suspend Plaintiff as a temporary measure, pending the Union's review of the documents.[9]  (Krebs Decl. Ex. K 202-03; Mazanec Aff. ¶ 41; Def.'s 56.1 Statement ¶ 72)  On Thursday, June 27, 2002, Mazanec held a meeting with Plaintiff to convey to her the Club's conclusion that her complaint against Leyva was meritless.  (Mazanec Aff. ¶ 42; Mazanec Aff. Exs. 67-68; Def.'s 56.1 Statement ¶ 73)

On June 28, 2002, Mazanec suspended Plaintiff, pending the Union's review.  (Augustin Tr. 840-42; Mazanec Aff. ¶ 43; Mazanec Aff. Ex. 69; Def.'s 56.1 Statement ¶ 74)  Mazanec, Dutton, and Armstrong were present for the July 29, 2002 meeting when Plaintiff was informed of her termination.  (Augustin Tr. 519; Mazanec Aff. ¶ 44; Mazanec Aff. Exs. 71-72; Def.'s 56.1 Statement ¶ 76)

_____

[9] Mazanec faxed the documents to Armstrong the morning of June 28, 2002.  (Mazanec Aff. ¶ 58; Mazanec Aff. Ex. 67; Def.'s 56.1 Statement ¶ 72)

### 20. Arbitration

The Union decided to grieve and arbitrate the termination pursuant to the terms of the CBA, which required there be "just cause" to terminate an employee.  (Mazanec Aff. Ex. 1, at 4; Def.'s 56.1 Statement ¶ 78)  Arbitration hearings took place over three days before arbitrator Richard Adelman, during which the Club presented six witnesses, Plaintiff presented her own testimony, and numerous exhibits were presented.  (Krebs Decl. Exs. J-L; Def.'s 56.1 Statement ¶ 78)  Throughout the proceedings, Plaintiff was represented by a Union attorney and both sides cross-examined witnesses, objected to evidence, and presented opening and closing statements.  (Krebs Decl. Exs. J-L; Def.'s 56.1 Statement ¶ 78)

On March 8, 2004, arbitrator Adelman issued his opinion and award upholding Plaintiff's discharge and denying the grievance.  (Krebs Decl. Ex. M)  Arbitrator Adelman concluded that, contrary to Plaintiff's sworn testimony, she had cursed and yelled at Leyva, including calling her a "fucking bitch."  (Krebs Decl. Ex. M 9)  The arbitrator found no support for Plaintiff's story that Leyva assaulted her, finding it to be a false accusation "in an apparent attempt to protect her from discharge," nor did he believe Plaintiff's contention that "the other workers conspired against her or that Mr. Mazanec favored Leyva."  (Krebs Decl. Ex. M 10-11)  The arbitrator held that the Club's requirement to get along with co-workers was not only reasonable but was "especially important among employees in the service industry in which the Club is engaged as it is necessary for the well-being of the Club," and that "employers must take appropriate steps to assure that guests and other Club employees are protected against employees who act improperly at the work place by engaging in altercations and arguments with co-workers."  (Krebs Decl Ex. M 10-11)  Finally, the arbitrator found that Plaintiff was repeatedly warned, including two final

warnings, regarding her inappropriate behavior and was specifically warned that similar additional behavior would result in her termination; thus, she had been given "ample opportunities . . . to correct her behavior, but . . . was either unable or unwilling to change her behavior." (Krebs Decl Ex. M 10-11)

### 21. Workers' Compensation

On July 8, 2002, a month after Plaintiff allegedly sustained her injuries from the June 8 incident, Plaintiff completed a workers' compensation form, which the board received on July 11, 2002. (Krebs Decl. Ex. C; Def.'s 56.1 Statement ¶ 80) Plaintiff never filed an accident report with the Yale Club based on the June 8 incident. (Mazanec Aff. ¶ 62; Def.'s 56.1 Statement ¶ 80) Once the Yale Club received notice of Plaintiff's claim on or about October 17, 2002, it filed, via its insurance carrier, notice that it objected to the claim. (Krebs Decl. Ex. D; Def.'s 56.1 Statement ¶ 80)

Hearings were held to determine whether Plaintiff was entitled to workers' compensation benefits out of alleged injuries she sustained on June 8, 2002. December 28, 2004, Workers' Compensation Law Judge Jesse Reisner ruled against Plaintiff. (Krebs Decl. Ex. I; Def.'s 56.1 Statement ¶ 81) Judge Reisner held that, based on the credible testimony of the other witnesses, as well as the arbitrator's finding that no assault had occurred, plaintiff's "testimony and claim are incredible." (Krebs Decl. Ex. I; Def.'s 56.1 Statement ¶ 81) Thus, "nothing whatsoever occurred on June 8, 2002 to have caused either a new neck injury or to have exacerbated a previous one." (Krebs Decl. Ex. I; Def.'s 56.1 Statement ¶ 81) This determination was upheld on appeal by a panel of the Workers' Compensation Board in a March 7, 2005 decision. (Mazanec Aff. ¶ 46; Mazanec Aff. Ex. 73; Def.'s 56.1 Statement ¶ 82) The Workers'

Compensation Board Panel found that the Workers' Compensation Law Judge's decision was "fully supported by the record," "that no errors of fact or law [were] made," and that the Law Judge's findings "were supported by the substantial weight of the credible evidence." (Mazanec Aff. ¶ 46; Mazanec Aff. Ex. 73; Def.'s 56.1 Statement ¶ 82) On June 1, 2005, while the Motion for Summary Judgment was pending before this Court, the full Workers' Compensation Board upheld the Law Judge's March 7, 2005 decision without qualification. (June 1, 2005 Workers' Compensation Board Administrative Decision)

## II.  Discussion

### A.  Summary Judgment Standard

Summary judgment shall be granted when "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant . . . ." *Lucente v. I.B.M.*, 310 F.3d 243, 253 (2d Cir. 2002) (citations omitted). To defeat Defendant's Motion for Summary Judgment, Plaintiff must make a sufficient showing of proof on each element of her claim for which she bears the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (holding that the moving party is not required "to produce evidence showing the absence of a genuine issue of material fact"); *Adorno v. Lord & Taylor*, No. 97 Civ. 4444, 1999 WL 759995, at *2 (S.D.N.Y. Sept. 27, 1999) (holding that the plaintiff must prove that "there is a reasonable amount of proof supporting the essential elements of [her] case which must be proved at trial").

The Supreme Court has stated that "trial courts should not 'treat discrimination

differently from other ultimate questions of fact.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alterations in original). While it is difficult for courts to ascertain discriminatory intent, courts must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 446 (2d Cir. 1999).

### B.  Hostile Work Environment Claims

Plaintiff asserts several claims for hostile work environment predicated on her race and gender.  Specifically, Plaintiff alleges that she was subjected to a hostile work environment at the Yale Club as a result of being indirectly referred to as a prostitute, a "black bitch," and a ticket agent; she was subjected to derogatory language regarding women, told she did not belong at the Yale Club and that her kind was not wanted; she was accused of starting altercations and was plotted against and threatened.  (Mem. in Opp. to Def.'s Mot. to Dismiss 13 ("Pl.'s Resp."))

In order to prevail on gender or racial discrimination claims based on a hostile work environment theory under Title VII, a plaintiff must show:  "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of . . . her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004) (citations and quotations omitted); *see also Alfano v. Costello*, 294 F.3d

365, 373 (2d Cir. 2002) (same (citation omitted)).  "Generally, the same standards apply to both race-based and sex-based hostile environment claims."  *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 436 n.2 (2d Cir. 1999).

"The first element of a hostile work environment claim has both an objective and subjective component:  'the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'"  *Petrosino*, 385 F.3d at 221 (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)); *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998).  To maintain a hostile work environment claim, Plaintiff "'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'"  *Alfano*, 294 F.3d at 374 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)); *accord Harris*, 510 U.S. at 21; *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment . . . there must be a steady barrage of opprobrious racial comments."  (citations omitted)); *Thomas v. New York City Health & Hosps. Corp.*, No. 02 Civ. 5159, 2004 WL 1962074, at *12 (S.D.N.Y. Sept. 2, 2004) (noting that "as a general rule, isolated instances of racially hostile name-calling and offensive remarks alone are ordinarily not severe enough to alter the conditions of employment").

The Complaint and Plaintiff's moving papers provide little to no guidance to the Court as to what incidents provide the basis for her harassment claim.  Therefore, in an abundance of caution, the Court looks to the incidents cited by Plaintiff in her deposition that she claims

40

support her allegations of harassment.  Plaintiff's harassment allegations based on her gender or

race are point to a number of incidents, namely:  (1) Sharp allegedly called Plaintiff a "meter

maid;" (*see* Part I.B.8) (2) Gonzales jokingly referred to prosciutto ham as "prostitute ham" in

her presence; (*see* Part I.B.6) (3) Regalado's comment that Plaintiff should go on vacation with a

Greek co-worker to Greece; (*see* Part I.B.4) (4) Regalado called Plaintiff a "black bitch" once;

(*see* Part I.B.8) (5) an unnamed cook called her a "bitch" on one occasion; (Augustin Tr. 658-59,

661) (6) Hannigan allegedly threw a bag of bread in Plaintiff's face; (*see* Part I.B.12) (7) Plaintiff

overheard Hannigan refer to several women as "bitches" and some men as "asses" or "assholes;"

(Augustin Tr. 303-309) (8) Velasco allegedly called Plaintiff an "animal," told her to be quiet,

and said she had no manners; (Augustin Tr. 586-87) (9) Lopez once called Plaintiff "garbage"

and a "fucking negrita;" (*see* Part I.B.8) (10) Plaintiff also claims she was discriminated against

based on a number of occasions where she allegedly received more work than her male

counterparts and interpreted that to be a result of her status as a black female.  (*see, e.g.*,

Augustin Tr. 553-55)

_____  "'There is no fixed number of incidents that a plaintiff must endure in order to establish a

hostile work environment; rather, [the Court] view[s] the circumstances in their totality,

examining the nature, severity, and frequency of the conduct'" alleged.  *Alfano*, 294 F.3d at 379

(quoting *Harris*, 510 U.S. at 23).  Assuming the Court found the alleged conduct can be

attributed to the Yale Club - a question the Court does not resolve - the Yale Club's conduct,

when viewed as a whole, cannot be characterized as sufficiently "severe" or "pervasive" to state

a hostile work environment claim.  Plaintiff's hostile work environment claim is predicated on

the various statements and actions noted above, the worst of which was allegedly being called a

"fucking negrita" once and a "black bitch" once by her co-workers.  Even if these statements,

along with the others alleged above, can be imputed to the Yale Club, comments related to

Plaintiff's gender or race were made, at most, four or five times, over the five-year employment

period in question.  Although the Court considers the use of any such remarks, even on a single

occasion to be deplorable, for purposes of evaluating a hostile environment claim under Title VII,

the Court finds the infrequent and sporadic nature of the remarks at issue, over the course of five

years, insufficient, as a matter of law, for Plaintiff to maintain a hostile work environment

claim.[10]  *See Petrosino*, 385 F.3d at 223 ("[i]solated incidents of offensive conduct (unless

extremely serious) will not support a claim of discriminatory harassment." (citing *Oncale v.

Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998))); *Alfano*, 294 F.3d at 380 (finding the

alleged conduct non-actionable when they were "too few, too separate in time, and too mild . . .

to create an abusive working environment."); *Trinidad v. New York City Dept. of Corr.*, 423 F.

Supp. 2d 151, 167-68 (S.D.N.Y. 2006) (finding isolated incidents of defendant calling plaintiff a

bitch and making sexual remarks over the course of her five and one-half years of employment

insufficient to support a claim of discriminatory harassment); *Mark v. Brookdale Univ. Hosp.*,

No. 04 Civ. 2497, 2005 WL 1521185, at *27 (E.D.N.Y. June 22, 2005) ("Plaintiff's hostile work

environment claims are premised upon two alleged isolated remarks . . . [these] comments,

assumed true only for purposes of summary judgment, are insufficient to give rise to a hostile

environment claim.  The 'blimp' remark, assumed . . . to be in reference to plaintiff's pregnancy,

combined with the 'black bitch' comment, are not sufficiently frequent and pervasive to support

---

[10] Since the Court finds Plaintiff's hostile work environment claim insufficient as a matter
of law, the Court does not address Defendant's additional argument that this claim is time barred.
(Br. in Supp of Def.'s Mot. for Summ. J. 15-16 ("Def.'s Br."))

an actionable hostile environment claim."); *Stepheny v. Brooklyn Hebrew Sch. for Special Children*, 356 F. Supp. 2d 248, 264 (E.D.N.Y. 2005) (finding five racially offensive comments of the term "white bitch," over the course of five months insufficient as a matter of law to establish hostile environment claim); *Pagan v. New York State Div. of Parole,* No. 98 Civ. 5840, 2003 WL 22723013, at *6 (S.D.N.Y. Nov. 18, 2003) (finding four instances of racially derogatory remarks by supervisor in the span of several months did not amount to a hostile work environment); *Stembridge v. City of New York*, 88 F. Supp. 2d 276, 286 (S.D.N.Y. 2000) (seven incidents over three years, including two instances of racial epithets uttered by supervisors toward plaintiff including directly calling plaintiff an "uppity nigger," while evincing racial hostility, do not establish a hostile work environment); *Carter v. Cornell Univ.,* 976 F. Supp. 224, 232 (S.D.N.Y. 1997) (six race-related disparaging comments over three years do not create a hostile work environment); *Williams v. Port Auth. of N.Y. & N.J.*, 880 F. Supp. 980, 991-92 (S.D.N.Y. 1995) (five racial slurs uttered by supervisors in plaintiff's presence over the course of two years did not establish hostile work environment).

## C.  Disparate Treatment and Retaliation Claims

         The Court next addresses Plaintiff's claim of disparate treatment allegedly based on her race or gender and her claim of retaliatory discharge based on her complaint regarding the Yale Club's alleged hostile work environment.

         Plaintiff alleges that since she "became employed by defendant she faced a steady stream and constant barrage of discriminatory conduct directed against her by her co-workers and management," and that the Yale Club failed to act on the discrimination.  (Pl.'s Resp. 10) Further, Plaintiff alleges that the circumstances surrounding her discharge give rise to an

inference of discrimination.  (Pl.'s Resp. 7-8)

In the context of a summary judgment motion, the Court must analyze both the disparate treatment and retaliation claims using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Reeves*, 530 U.S. at 142 (noting application of *McDonnell Douglas* burden shifting framework to discrimination cases); *see also Wilson v. New York City Dept. of Transp.*, No. 01 Civ. 7398, 2005 WL 2385866, at *15 (S.D.N.Y. Sept. 28, 2005) (citations omitted) (noting disparate treatment and retaliation claims brought under Title VII are analyzed under *McDonnell Douglas* burden shifting framework).  At the outset, Plaintiff has the burden of "proving by the preponderance of the evidence a *prima facie* case of discrimination."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  To establish a prima facie case of gender or race based disparate treatment, Plaintiff must show that (1) she belongs to a protected class; (2) she was performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class.  *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).[11]  Plaintiff's initial burden is *de minimis*.  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001).

---

[11] "A plaintiff raising a claim of retaliatory discharge has a similar burden of initially establishing a prima facie case of retaliation.  To make out a prima facie case of retaliation, an employee must show that the employee was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the connected activity and the adverse employment action." *Collins v. New York Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002) (citations omitted); *see also Wilson*, 2005 WL 2385866, at *16 (same) (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).

<u>1.  Plaintiff has not Demonstrated a Prima Facie Case of Disparate Treatment</u>

There is no dispute that Plaintiff satisfies the first and third elements of a disparate treatment claim.  As to the second element, whether she was performing her duties satisfactorily, a Plaintiff "need not demonstrate that [her] performance was flawless or superior[,] [r]ather, [she] need only demonstrate that [she] possesses the basic skills necessary for the performance of [her] job."  *de la Cruz v. New York City Human Res. Admin. Dept. of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir. 1996) (citations and quotations omitted); *accord Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 171-72 (2d Cir. 2006) ("'*McDonnell Douglas* requires only a minimal showing of qualification to establish a *prima facie* claim. . . .  We have no doubt that . . . misconduct may certainly provide a legitimate and non-discriminatory reason to terminate an employee.  This misconduct is distinct, however, from the issue of minimal qualification to perform a job.  An individual may well have the ability to perform job duties, even if her conduct on the job is inappropriate or offensive.'"  (quoting *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991))); *Gregory v. Daly*, 243 F.3d 687, 696-97 (2d Cir. 2001) ("[T]he qualification prong, as to which the initial burden lies on plaintiff, cannot be transformed into a requirement that the plaintiff anticipate and disprove an employer's explanation that inadequate ability or performance justified the job action at issue.").  The Yale Club argues that Plaintiff is unable to show the second element of the disparate treatment claim because she cannot demonstrate that she was qualified for her position due to her inability to get along with her co-workers.  (Def.'s Br. 4-5)  Plaintiff disagrees, contending "there are no documents or other evidence presented to establish that plaintiff actually performed her job in any manner other than at least satisfactorily." (Pl.'s Resp. 7)  Due to the fact that Defendant hired, promoted, and retained Plaintiff for a

significant period of time, Plaintiff has sufficiently pled the second prong of her prima facie disparate treatment claim, that she was qualified for the position. *See Gregory*, 243 F.3d at 696. However, "[a]n employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action." *Id.*

With the first three elements of Plaintiff's prima facie disparate treatment satisfied, the Court turns to the fourth element – whether the adverse employment action occurred in circumstances giving rise to an inference of discrimination on the basis of Plaintiff's membership in that class. At Plaintiff's request, the termination in this case was subject to an arbitration in accordance with the CBA. The arbitrator was selected jointly by the parties through a neutral procedure (Def.'s Br. 7) and Plaintiff has not alleged, nor could she credibly allege, that the arbitration was biased. Throughout the arbitration hearing, Plaintiff was represented by union counsel and the Yale Club had the burden of proof of showing "just cause" for Plaintiff's termination.[12] (Def.'s Br. 8) The hearings consisted of three days of hearings, including the testimony and cross-examination of seven witnesses (including Plaintiff), objections, numerous exhibits, and opening and closing arguments. (Def.'s Br. 8)

Arbitrator Adelman issued a detailed and cogently reasoned twelve-page opinion summarizing the evidence, upholding Plaintiff's discharge, and denying the grievance. (Krebs Decl. Ex. M) Contrary to Plaintiff's sworn testimony, the arbitrator concluded that Plaintiff

---

[12] In her 56.1 Reply Statement, Plaintiff, for the first time states that she does "not agree with the [arbitrator's] decision and believe that I was not properly represented before the arbitrator by my union." (Pl.'s Resp. 56.1 Statement ¶ 33) However, Plaintiff fails to state what, if anything, was improper about the union's representation nor does she state what she would have done differently. Thus, this conclusory claim is meritless.

cursed and yelled at Leyva, including calling her a "fucking bitch."  (Krebs Decl Ex. M 9)  The

arbitrator also found no support for Plaintiff's story that Leyva assaulted her, finding it to be a

false accusation "in an apparent attempt to protect her from discharge," nor did he believe

Plaintiff's contention that "the other workers conspired against her or that Mr. Mazanec favored

Leyva."  (Krebs Decl Ex. M 10-11)  The arbitrator held that the Club's requirement to get along

with co-workers not only was reasonable but was "especially important among employees in the

service industry in which the Club is engaged as it is necessary for the well-being of the Club,"

and that "employers must take appropriate steps to assure that guests and other Club employees

are protected against employees who act improperly at the work place by engaging in altercations

and arguments with co-workers."  (Krebs Decl Ex. M 10-11)  Finally, the arbitrator found that

Plaintiff was repeatedly warned, including two final warnings, regarding her inappropriate

behavior and was specifically warned that similar additional behavior would result in her

termination; thus, she had been given "ample opportunities . . . to correct her behavior, but . . .

was either unable or unwilling to change her behavior."  (Krebs Decl Ex. M 10-11)

In *Collins*, the Second Circuit held that a fair hearing before a neutral arbitrator who had

the power to prevent the firing was "highly probative of the absence of discriminatory intent in

th[e] termination."  305 F.3d at 119 (citing *Alexander v. Gardener-Denver Co.*, 415 U.S. 36, 60

n.21 (1974)).  In so doing, *Collins* found that the plaintiff there had offered insufficient evidence

of causation linking his termination to discriminatory or retaliatory motives, and explained the

governing standard:

> In sum, a negative arbitration decision rendered under a CBA does
> not preclude a Title VII action by a discharged employee.
> However, a decision by an independent tribunal that is not itself

> subject to a claim of bias will attenuate a plaintiff's proof of the
> requisite causal link.  Where, as here, the decision follows an
> evidentiary hearing and is based on substantial evidence, the Title
> VII plaintiff, to survive a motion for summary judgment must
> present strong evidence that the decision was wrong as a matter of
> fact – e.g. new evidence not before the tribunal – or that the
> impartiality of the proceeding was somehow compromised.

*Id.*  In this case, there is no substantiated allegation by Plaintiff that the decision of the arbitrator

on the June 8, 2002 charges and the subsequent termination was "somehow compromised," nor is

there any suggestion that the decision was wrong in the sense that it was against the weight of the

evidence or incorrect in light of new evidence.  *See Gallimore-Wright*, 354 F. Supp. 2d at 491

(applying *Collins* and dismissing retaliation claim by upholding Public Law Board decision

where there was no challenge to the "arbitrator's" independence or allegation that the decision

was against the weight of the evidence).  Thus, in line with *Collins*, the Court is persuaded by the

well-reasoned arbitrator's decision, which found that Plaintiff was properly terminated.  The

arbitrator's decision is "strong evidence of a lack of retaliatory or discriminatory intent which, in

the absence of any meaningful proof to the contrary, prevented the plaintiff from making out a

*prima facie* case."[13]  *Id.* at 492.  Accordingly, since the arbitrator received all the available

evidence in an evenhanded proceeding and rendered a decision consistent with the overwhelming

evidence of Plaintiff's attack on Leyva and false accusations against Leyva, and Plaintiff has

failed to put forth any evidence that the arbitrator's decision was wrong, the Court concludes that

no reasonable jury could find that Plaintiff's discharge by the Yale Club supports an inference of

discrimination or retaliation.  *Collins*, 305 F.3d at 119-20.

---

[13] Although the Workers' Compensation hearing addressed different questions than the
arbitration, the Workers' Compensation Law Judge's opinion, and subsequent affirmations on
appeal, substantiated the arbitrator's decision.

48

Plaintiff also argues that she raised an inference of racial or gender discrimination sufficient to establish her prima facie case by proffering evidence that similarly situated employees were treated more favorably.  (Pl.'s Resp. 9)  Such an inference may be established by showing that "the employer treated plaintiff less favorably than a similarly situated employee outside [her] protected group."  *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (citations and quotations omitted).  In this context, a plaintiff "'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'"  *Id.* (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)); *see also Soliman v. Deutsche Bank AG*, No. 03 Civ. 104, 2004 WL 1124689, at *9 (S.D.N.Y. May 20, 2004) ("There must be a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical.").  "The 'all material respects' standard means Plaintiff must show:  (1) [her] co-employees were subject to the same performance evaluation and disciplinary standards, and (2) the similarly situated and undisciplined employees engaged in conduct comparable to that engaged in by Plaintiff."  *Joseph v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 96 Civ. 9015, 2004 WL 1907750, at *15 (S.D.N.Y. Aug. 25, 2004) (citing *Graham*, 230 F.3d at 40).

Leyva is the only employee Plaintiff alleges who was treated more favorably, despite being similarly situated.  (Pl.'s Resp. 9)  Essentially, Plaintiff implies that Leyva, who is not African-American, was implicated in the June 8, 2002 incident, yet she was not terminated.  However, Plaintiff has submitted no evidence suggesting that Plaintiff and Leyva had similar disciplinary and employment histories.  In fact, the only reasonable inference from the record is that Plaintiff's prior conduct and disciplinary and employment history, including having received

two final warnings prior to the June 8 incident, does not resemble Leyva's employment history. Thus, the evidence is legally insufficient to establish that the fellow employee to whom Plaintiff compares herself is "similarly situated." *See D'Cunha v. New York Hosp. Med. Ctr. of Queens*, No. 02 Civ. 5445, 2006 WL 544470, at *7 (E.D.N.Y. Mar. 6, 2006) (finding comparison to another employee with a better track record who jointly participated in the error that led to the termination unavailing because the employer acted reasonably in disciplining the retained employee less severely "based upon her nearly unblemished work record"). As a result, this claim fails.

Plaintiff has not proffered sufficient evidence to prove the fourth element of her prima facie case. Therefore, the Court need not proceed with the *McDonnell Douglas* analysis. However, even if the Court were to assume that Plaintiff has satisfied all four elements of the prima facie test, as discussed below, the Defendant has offered a legitimate, non-discriminatory reason for her termination, and Plaintiff has failed to rebut the reason with evidence of pretext.

### 2. Prima Facie Case of Retaliation

Plaintiff also asserts that her termination was in retaliation for her complaining about alleged discriminatory conduct directed towards her by her co-workers and management. (Pl.'s Resp. 10) As noted above, "[t]o make out a prima facie case of retaliation, an employee must show that the employee was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the connected activity and the adverse employment action." *Collins*, 305 F.3d at 118 (citations omitted); *see also Wilson*, 2005 WL 2385866, at *16 (same) (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).

Here, in light of the arbitrator's decision consisting of "strong evidence" of a lack of retaliatory intent by the Yale Club, it is doubtful that Plaintiff can meet her prima facie retaliation burden.  Furthermore, the admissible evidence put forth by Plaintiff does not make it at all clear that she complained to supervisors of conduct indicative of gender or race based hostility.  However, viewing all facts in the light most favorable to Plaintiff, and taking as true her assertions that she complained about such conduct to supervisors, the Court will assume for purposes of this analysis that Plaintiff has put forward a prima facie case.  *See Doherty v. Nederlander Producing Co.*, No. 04 Civ. 3324, 2006 WL 2239421, at *6 (S.D.N.Y. Aug. 4, 2006) (accepting the plaintiff's allegations of retaliation as true).  Similarly, while the evidence put forth by Plaintiff raises serious questions regarding "whether she can show a sufficient temporal connection between the complaints and the . . . termination to support the causal connection prong of the standard, the Court will assume for purposes of this analysis that Plaintiff has met that aspect of her initial burden as well."  *Id.*

As with the disparate treatment claim, once a plaintiff has put forth a prima facie case of retaliation, the defendant has the burden of coming forward with a "legitimate, nondiscriminatory business reason for the adverse employment action."  *Wilson*, 2005 WL 2385866, at *16 (citing *McDonnell Douglas*, 411 U.S. at 802) (noting *McDonnell Douglas* burden shifting standard applies to both retaliation and disparate treatment claims).

### 3.  Defendant's Rationale for Discharge

Assuming, *arguendo*, that Plaintiff has established a prima facie case of disparate treatment and retaliation, the burden shifts to Defendant to offer a legitimate, non-discriminatory rationale for its decision.  *See Reeves*, 530 U.S. at 142 (disparate treatment); *Jute v. Hamilton*

51

*Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (applying to a retaliation claim the burden-shifting framework of *McDonnell Douglas*).  This burden is merely "one of production, not persuasion; it can involve no credibility assessment."  *Reeves*, 530 U.S. at 142 (citation omitted).

Defendant has submitted strong evidence that it terminated Plaintiff because, after two final warnings for rude and antagonistic behavior towards her co-workers, she argued with and cursed at a co-worker and, not for the first time, concocted false-charges against a co-worker in an apparent attempt to protect her from discharge.  While Plaintiff characterizes herself as an innocent victim of Leyva's aggressive and threatening behavior, the facts reveal that all of the witnesses to the events of June 8, 2002 noted that Plaintiff was the one cursing Leyva and denied that Leyva attacked Plaintiff in any way.  In addition, although Plaintiff never had any difficulty bringing complaints against other co-workers, it is undisputed that Plaintiff's complaint against Leyva regarding the June 8, 2002 incident, only occurred nine days after the incident and only after she learned of Leyva's complaint.  Thus, especially in light of the arbitrator's findings, Defendant has produced ample evidence of a legitimate, non-discriminatory reason for discharging Plaintiff.  *See Meiri*, 759 F.2d at 997 (finding inability to "get along" with co-workers "represents a legitimate, nondiscriminatory reason for an employment decision").

Once the employer has articulated non-discriminatory reasons for Plaintiff's termination, the burden shifts back to Plaintiff to put forth admissible evidence to show pretext, i.e., "circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant employment decision was more likely than not based in whole or in part on discrimination."  *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (citation and quotation omitted); *see also Jute*, 420 F.3d at 174 (noting that once an employer offers non-retaliatory

reason for adverse employment action "the employee must show that retaliation was a substantial reason for the adverse employment action" (citation omitted)); *Das v. Our Lady of Mercy Med. Ctr.*, No. 00 Civ. 2574, 2002 WL 826877, at *7 (S.D.N.Y. Apr. 30, 2002) (noting that once an employer stated legitimate, nondiscriminatory reason for its termination decision, the plaintiff must come forward with "'concrete particulars'" of discrimination in order to defeat summary judgment (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984))). Plaintiff maintains pretext exists as evidenced by the Yale Club's failure to effectively act on Plaintiff's prior complaints and by "Mazanec's behavior towards Augustin [that] reveal[ed] he disliked her and wanted her terminated for complaining about discrimination."  (Pl.'s Resp. 10) Plaintiff's argument that pretext existed for her termination fails for lack of support.

The Yale Club's extensive and thorough investigations into Plaintiff's numerous complaints belie her allegation that the Club failed to act on her complaints.  *See Estrada v. Lehman Bros., Inc.*, No. 99 Civ. 8559, 2001 WL 43605, at *6 (S.D.N.Y. Jan. 18, 2001) (finding plaintiff's evidence of pretext lacking because, among other things, "[h]is complaints were taken seriously and investigated by [d]efendant").  That the Club often did not believe Plaintiff's version of events does not alter the fact that it meticulously followed through on Plaintiff's multiple complaints and informed Plaintiff of its decisions regarding those complaints.  *See id.* at *5 ("The mere fact that [plaintiff] may disagree with [her] employer's actions or think that [her] behavior was justified does not raise an inference of pretext."  (citations omitted)).

Plaintiff's claim that Mazanec's behavior towards her was evidence of pretext, also fails for lack of support.  Specifically, Plaintiff testified that when she complained to Mazanec about her termination, he replied that Leyva was "his woman" and that "he has power over" Plaintiff.

(Augustin Tr. 794, 804)  The Court does not make credibility determinations at this stage and accepts Plaintiff's testimony as true.  Nevertheless, Plaintiff still fails to present proof of pretext sufficient to carry her burden of persuasion on the issue of discrimination.  If Mazanec's statements were made, the inference Plaintiff would have the Court believe, at most, is that due to his alleged relationship with Leyva, he decided to terminate Plaintiff.  A reasonable trier of fact could not reasonably find that Plaintiff's gender or race was a factor in the termination decision.  *See DeCintio v. Westchester Co. Med. Ctr.*, 807 F.2d 304, 308 (2d Cir. 1986) (holding employer's preference for paramour not a basis for Title VII claims); *Voels v. New York*, 180 F. Supp. 2d 508, 515 (S.D.N.Y. 2002) (holding no cognizable gender discrimination claim where preferential treatment was based on supervisor's relationship with preferred employee (citing *DeCintio*, 807 F.2d at 308)); *see also Oncale*, 525 U.S. at 81 (Title VII is not a "general civility code"); *Alfano*, 294 F.3d at 377 (2d Cir. 2002) ("[M]any bosses are harsh, unjust, and rude. It is therefore important . . . to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel appeals." (citations omitted)).

"Accordingly, and particularly in view of the probative value accorded the arbitrator's affirmance of Defendant's proffered non-discriminatory reasons for terminating Plaintiff's employment, Plaintiff . . . [has] failed to create a genuine issue of material fact as to whether Defendant's reasons for terminating Plaintiff were pretextual."  *Joseph*, 2004 WL 1907750, at *15.  Since Defendant's reasons for terminating Plaintiff were both legitimate and non-discriminatory, for Plaintiff's retaliation and disparate treatment claims to survive, Plaintiff had the burden, under *McDonnell Douglas*, to put forth admissible evidence to show pretext.

Inasmuch as Plaintiff has failed to put forth circumstances that would be sufficient to permit a rational finder of fact to infer that Defendant's employment decision was more likely than not based in whole or in part on discrimination, Defendant's Motion for Summary Judgment on the retaliation and disparate treatment claims is granted.

### D.  State Law Claims

In an apparent abundance of caution, Defendant argues that if Plaintiff also asserted claims for retaliation, disparate treatment, and hostile work environment under either the New York State Human Rights Law ("NYSHRL") or the New York City Human Rights Law ("NYCHRL"), such claims also fail.  (Def.'s Br. 3 n.1)  Neither the Complaint nor Plaintiff's motion papers assert or raise NYSHRL or NYCHRL claims.  Nevertheless, the Court agrees with Defendant's conclusion that if such claims were raised, they also merit dismissal.

In general, hostile work environment, retaliation, and disparate treatment claims under the NYSHRL and the NYCHRL are reviewed under the same standards as Title VII claims.  *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) ("Hostile work environment and retaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII."); *Cruz v. Coach Stores*, 202 F.3d 560, 565 n.1 (2d Cir. 2000) ("[C]onsideration of claims brought under the state and city human rights laws parallels the analysis used in Title VII claims." (citations omitted)).  Thus, Plaintiff's hostile environment and disparate treatment claims fail for the same reasons as stated above.

As recently amended, the standards applied to retaliation claims under the NYCHRL seem to differ from federal law in at least one respect.  Namely, unlike the federal standard, the retaliation complained of "need not result in . . . a materially adverse change in the terms and

conditions of employment . . . provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity." N.Y.C. Admin Code § 8-107(7), as amended by § 3(7) of the "Local Civil Rights Restoration Act of 2005."  Even under the more expansive protection apparently afforded under the New York City Code, Plaintiff's retaliation claim under the NYCHRL still fails, because, as discussed above, Plaintiff ultimately failed to put forth evidence sufficient to permit a rational finder of fact to infer that Defendant's termination was more likely than not retaliation for protected activity engaged in by Plaintiff.

E.  Punitive Damages

To the extent that Plaintiff's complaint alleges a claim for punitive damages that claim is denied.  "Punitive damages are available under Title VII in cases where 'the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'"  *Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 384 (2d Cir. 2001) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529-30 (1999)).  Since Plaintiff has failed to show Defendant engaged in a discriminatory practice, let alone an intentional discriminatory practice, this claim must fail.

## III. Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment is granted in all

respects. The Clerk of Court is directed to enter judgment accordingly and close the case.

SO ORDERED.

Dated:        September 15, 2006
New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

57